# HARTFORD HOSPITAL ET AL. *v.* DEPARTMENT OF CONSUMER PROTECTION ET AL.
## (SC 15753)

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.[1]

Argued October 31, 1997—officially released March 3, 1998

---

[1] Justice McDonald recused himself after oral argument in this case. The parties have agreed to have this appeal decided by a panel of this court consisting of the four remaining justices who heard the appeal.

*Megan J. O'Neill,* assistant attorney general, with whom were *Steven M. Rutstein,* assistant attorney general, and, on the brief, *Richard Blumenthal,* attorney general, for the appellants (defendants).

*Gerald P. Stergio,* with whom, on the brief, were *John W. Mahoney* and *Henry J. Zaccardi,* for the appellees (plaintiffs).

*Opinion*

PALMER, J. This appeal requires us to determine whether hospital employees who perform plumbing work for the hospital are exempt from the licensure requirements of chapter 393 of the General Statutes, § 20-330 et seq.[2] We conclude that they are not exempt.

The following facts and procedural history are undisputed. On October 7, 1994, the defendant plumbing and piping work board (board)[3] issued complaints against the plaintiffs, Hartford Hospital (hospital) and Herve Gelinas, Charles Rowe and Amrit Kalicharen, three of the hospital's employees.[4] Specifically, the board

---

[2] Chapter 393 of the General Statutes sets forth a comprehensive scheme for the licensure of persons engaged in the following occupations: (1) electrical work; (2) plumbing and piping work; (3) heating, piping and cooling work, including solar installation, repair and maintenance work; (4) elevator installation, repair and maintenance work; and (5) fire protection sprinkler systems work. The licensure function for each of these occupations is performed, respectively, by the following five examining boards within the department of consumer protection: (1) the electrical work board; (2) the plumbing and piping work board; (3) the heating, piping and cooling work board; (4) the elevator installation, repair and maintenance board; and (5) the fire protection sprinkler systems board. See General Statutes § 20-331.

[3] The board is an agency of the named defendant, the department of consumer protection. See footnote 2 of this opinion. References hereinafter to the defendants include both the department of consumer protection and the board.

[4] The board alleged that each of the plaintiffs had violated certain statutory provisions from February 18, 1989, through May 9, 1994.

alleged that the hospital had violated General Statutes
§§ 20-334, 20-337 and 20-341[5] because certain of its

---

[5] General Statutes § 20-334 provides: "Certificate or card of registration.
License. Suspension or revocation. No person shall engage in, practice or
offer to perform the work of any occupation covered by this chapter in this
state unless he has first obtained a license as provided [by the examination
provisions] in section 20-333, or possesses a card of registration from the
State Apprentice Training Division or the board and shall be subject to all
the regulations established under this chapter for the purpose of governing
apprenticeship training or has been issued a license for such particular work
under this chapter prior to July 6, 1967. The Department of Consumer
Protection shall furnish to each qualified applicant a license certifying that
the holder thereof is entitled to engage in the work or occupation for which
the person has been issued a license under this chapter, and the holder of
such license shall carry it on his person while engaging in such work or
occupation. Such license shall be shown to any properly interested person
on request. No such license shall be transferred to or used by any person
other than the person to whom the license was issued. Contractors shall
display their state license number on all commercial vehicles used in their
business and shall display such number in a conspicuous manner on all
printed advertisements, bid proposals, contracts, invoices and on all statio-
nery used in their business. The department shall keep a register in which
shall be entered the names of all persons to whom such licenses are issued,
and said register shall be at all times open to public inspection. Each board
may suspend or revoke any license or certificate granted or issued by it if
the holder thereof is convicted of a felony, is grossly incompetent, engages
in malpractice or unethical conduct or knowingly makes false, misleading
or deceptive representations regarding his work or violates the rules and
regulations established under this chapter. Before any license is suspended
or revoked, such holder shall be given notice and opportunity for hearing
as provided in regulations established by the Commissioner of Consumer
Protection. Any person whose license has been suspended or revoked may,
after ninety days, apply to the board to have the same reinstated. Although
§ 20-334 has been amended since 1989, the time of the initial alleged violation;
Public Acts 1991, No. 91-407, §§ 25, 42; there are no relevant substantive
changes for the purposes of this opinion.

General Statutes § 20-337 provides: "Ownership of businesses. Nothing
in this chapter shall require that the ownership or control of a business
engaged in providing the work or services licensed under the provisions of
this chapter be vested in a licensed person, but all the work and services
covered by the definitions set forth in section 20-330 shall be performed by
persons licensed for such work or occupation under this chapter."

General Statutes (Rev. to 1997) § 20-341 provides: "Penalties for violations.
(a) Any person who engages in or practices the work or occupation for
which a license is required by this chapter without having first obtained an
apprentice permit or a certificate and license for such work, or who wilfully
employs or supplies for employment a person who does not have a certificate

employees had performed plumbing and piping work[6] on the hospital premises without a certificate, license

and license for such work or who wilfully and falsely pretends to qualify to engage in or practice such work or occupation, or who engages in or practices any of the work or occupations for which a license is required by this chapter after the expiration of his license, or who violates any other provision of this chapter, unless the penalty is otherwise specifically prescribed, shall be fined not more than one hundred dollars for each such violation.

"(b) The appropriate examining board may, after notice and hearing, impose a civil penalty on any person who engages in or practices the work or occupation for which a license or apprentice registration certificate is required by this chapter without having first obtained such a certificate or license, or who wilfully employs or supplies for employment a person who does not have such a license or certificate or who wilfully and falsely pretends to qualify to engage in or practice such work or occupation, or who engages in or practices any of the work or occupations for which a license or certificate is required by this chapter after the expiration of his license or certificate or who violates any of the provisions of this chapter or the regulations adopted pursuant thereto. Such penalty shall be in an amount not more than five hundred dollars for a first violation of this subsection, not more than seven hundred fifty dollars for a second violation and not more than one thousand five hundred dollars for each violation of this subsection occurring less than three years after a second or subsequent violation of this subsection, except that any individual employed as an apprentice but improperly registered shall not be penalized for a first offense." Although § 20-341 has been amended since 1989, the time of the initial alleged violation; Public Acts 1989, No. 89-309; Public Acts 1991, No. 91-407, §§ 24, 42; Public Acts 1997, No. 97-263, § 6; there are no relevant substantive changes for the purposes of this opinion.

[6] As used in chapter 393 of the General Statutes, " '[p]lumbing and piping work' means the installation, repair, replacement, alteration or maintenance of gas, water and associated fixtures, laboratory equipment, sanitary equipment, other than subsurface sewage disposal systems, fire prevention apparatus, all water systems for human usage, sewage treatment facilities and all associated fittings within a building and shall include lateral storm and sanitary lines from buildings to the mains, swimming pools and pumping equipment, and shall include making connections to back flow prevention devices, and shall include low voltage wiring, not exceeding twenty-four volts, used within a lawn sprinkler system, but on and after July 1, 1984, shall not include solar work, except for the repair of those portions of a solar hot water heating system which include the basic domestic hot water tank and the tie-in to the potable water system and on and after April 1, 1989, shall not include the installation, repair, replacement, alteration or maintenance of fire prevention apparatus within a structure, except for standpipes which are not connected to sprinkler systems . . . ." General Statutes § 20-330 (3). Although § 20-330 (3) has been amended since 1989,

or registration to do so. The board further alleged that Gelinas, a foreman, had violated the licensure requirements of chapter 393 by causing plumbing work to be performed by hospital employees who were not licensed or registered to do such work.[7] With respect to Rowe and Kalicharen, the board claimed that they had violated statutory licensure provisions by performing plumbing work at the hospital without a license.

In November, 1994, the plaintiffs sought a declaratory ruling[8] that the statutory licensure requirements are inapplicable to them because the work performed by Rowe and Kalicharen was primarily maintenance work and not plumbing installation work. Alternatively, the plaintiffs claimed that they are exempt from the requirements of chapter 393 because the hospital is an "industrial firm" within the meaning of § 20-340 (6).[9] After a

the time of the initial alleged violation; Public Acts 1990, No. 90-194, § 1; there are no relevant substantive changes for the purposes of this opinion.

[7] The board also alleged that Gelinas, a licensed plumber, had failed to display properly his contractor's license number on his business cards. General Statutes § 20-334; see footnote 5 of this opinion.

[8] See General Statutes § 4-166.

[9] General Statutes § 20-340 provides: "Exemptions from licensing requirements. The provisions of this chapter shall not apply to (1) persons employed by any federal, state or municipal agency; (2) employees of any public service company regulated by the state Department of Public Utility Control or of any corporate affiliate of any such company when the work performed by such affiliate is on behalf of a public service company, in either case only if the work performed is in connection with the rendition of public utility service, including the installation or maintenance of wire for community antenna television service, or is in connection with the installation or maintenance of wire or telephone sets for single-line telephone service located inside the premises of a consumer; (3) employees of any municipal corporation specially chartered by the state of Connecticut; (4) employees of any contractor while said contractor is performing electrical-line or emergency work for any public service company; (5) persons engaged in the installation, maintenance, repair and service of electrical or other appliances of a size customarily used for domestic use where such installation commences at an outlet receptacle or connection previously installed by persons licensed to do the same and maintenance, repair and service is confined to the appliance itself and its internal operation; (6) *employees of industrial*

hearing, the board issued a declaratory ruling in which it concluded that the work performed by Rowe and Kalicharen constituted plumbing and piping work under § 20-330 (3) and, further, that § 20-340 (6) does not exempt the hospital's employees from the statutory licensure requirements.

The plaintiffs appealed from the declaratory ruling of the board to the Superior Court pursuant to General Statutes § 4-183, claiming that § 20-340 (6) exempts employees of the hospital from the licensure requirements of chapter 393.[10] The trial court agreed with the plaintiffs that the hospital is an "industrial firm" within the meaning of § 20-340 (6) and, consequently, sustained the plaintiffs' appeal. The defendants appealed

firms whose main duties concern the maintenance of the electrical, plumbing and piping, solar, heating, piping and cooling, or elevator installation, repair and maintenance work of such firm on its own premises or on premises leased by it for its own use; (7) the fabrication of electrical, plumbing and piping, fire protection sprinkler systems, solar, heating, piping and cooling or elevator installation, repair and maintenance equipment used in the production of goods sold by industrial firms; (8) persons performing work necessary to the manufacture or repair of any apparatus, appliances, fixtures, equipment or devices produced by it for sale or lease; (9) employees of stage and theatrical companies performing the operation, installation and maintenance of electrical equipment if such installation commences at an outlet receptacle or connection previously installed by persons licensed to make such installation; (10) employees of carnivals, circuses or similar transient amusement shows who install electrical work, provided such installation shall be subject to the approval of the State Fire Marshal prior to use as otherwise provided by law and shall comply with applicable municipal ordinances and regulations; (11) persons engaged in the installation, maintenance, repair and service of electrical, plumbing, fire protection sprinkler systems, solar, and heating, piping and cooling equipment in and about single-family residences owned and occupied or to be occupied by such persons; provided any such installation, maintenance and repair shall be subject to inspection and approval by the building official of the municipality in which such residence is located and shall conform to the requirements of the State Building Code." (Emphasis added.) Although § 20-340 has been amended since 1989, the time of the initial alleged violation; Public Acts 1996; No. 96-21, §§ 1, 3; there are no relevant substantive changes for the purposes of this opinion.

[10] The plaintiffs did not pursue their claim that the statutory licensure requirements were inapplicable to them on the ground that Rowe and Kalicharen had not performed plumbing work within the meaning of § 20-330 (3).

from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). On appeal, the defendants renew their argument that the hospital is not an "industrial firm" under § 20-340 (6) and, therefore, is not exempt from the licensure requirements of chapter 393. We agree with the defendants.

"[B]ecause our resolution of the [defendants'] claim requires the application of a statutory provision, namely, [§ 20-340 (6)], to a specific factual scenario, we are . . . guided by well established tenets of statutory interpretation. It is fundamental that statutory construction requires us to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 140–41, 680 A.2d 1329 (1996). "Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny, as in this case, the agency's determination is not entitled to special deference." *Angelsea Productions, Inc.* v. *Commission on Human Rights & Opportunities*, 236 Conn. 681, 688, 674 A.2d 1300 (1996); see *Duni* v. *United Technologies Corp.*, 239 Conn. 19, 25, 682 A.2d 99 (1996). Finally, exemptions to statutes are to be strictly construed; *Cannata* v. *Dept. of Environmental Protection*, supra, 141; and "those who claim the benefit of an exception under a statute have the burden of proving that they come within the limited

class for whose benefit it was established." *Conservation Commission* v. *Price*, 193 Conn. 414, 424, 479 A.2d 187 (1984); *Aaron* v. *Conservation Commission*, 183 Conn. 532, 549, 441 A.2d 30 (1981). With these principles in mind, we turn to the defendants' claim.

Section 20-334 provides that individuals performing certain kinds of work, including plumbing and piping work, must be licensed. Since the enactment of the statutory licensure requirements in 1965,[11] the legislature has created eleven exemptions to the licensing mandate of § 20-334, including the exemption under § 20-340 (6) for any person employed by an "industrial firm" whose main duties concern, inter alia, plumbing and piping work.[12] The plaintiffs' sole claim of exemption from the requirements of § 20-334 is that the hospital is an "industrial firm" under § 20-340 (6). Specifically, the plaintiffs, urging a broad construction of the term "industrial firm," maintain that that term encompasses all commercial enterprises engaged in any industry, including the health industry. The defendants, on the other hand, contend that the term applies only to business entities involved in manufacturing activities and, consequently, that the hospital, because it is not involved in such activities, does not fall within the exemption.

Where, as here, a statute does not define a term, "we refer to [its] commonly approved usage for guidance in our determination." *Williams* v. *Best Cleaners, Inc.*,

---

[11] See Public Acts 1965, No. 493. Prior to 1965, occupational licensing of the trades regulated under chapter 393 was done pursuant to municipal ordinance.

[12] When the licensure requirements were first adopted, only three exemptions were created, including the exemption for any person employed by an "industrial firm." See *White Oak Corp.* v. *Dept. of Consumer Protection*, 12 Conn. App. 251, 256, 530 A.2d 641 (1987). The original three exemptions are essentially the same as the current versions of subdivisions (1), (2) and (6) of § 20-340. Id., 256 n.8.

237 Conn. 490, 500, 677 A.2d 1356 (1996); see *Krafick* v. *Krafick*, 234 Conn. 783, 794, 663 A.2d 365 (1995). The term "industrial firm" is not defined in the dictionary; see, e.g., Webster's Third New International Dictionary; and the dictionary definitions of "industrial" and "firm" provide little guidance as to whether the term "industrial firm" connotes only an enterprise that is involved in manufacturing activities, as the defendants claim, or one that is engaged in any form of business or commercial activity, as the plaintiffs contend.[13] Moreover, we have not had previous occasion to define the precise term "industrial firm," in this or any other context. Cf. *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 754–55, 601 A.2d 1005 (1992) (discussing term "industrial plant" as defined in regulations relating to taxing statutes); *Roan* v. *Connecticut Industrial Building Commission*, 150 Conn. 333, 335–36, 189 A.2d 399 (1963) (discussing term "industrial plant" as defined under statute, since repealed, creating industrial building commission).

As the plaintiffs conceded at oral argument, however, the term "industrial firm" is not one which, in common parlance, ordinarily would be deemed to include a hospital. Moreover, the plaintiffs further acknowledge that, under the expansive definition of the term they espouse,

---

[13] Webster's Third New International Dictionary defines "industrial" as "of or belonging to industry." "Industry" is defined as follows: "[a]: a department or branch of a craft, art, business, or manufacture: a division of productive or profit-making labor; esp[ecially]: one that employs a large personnel and capital esp[ecially] in manufacturing . . . [b]: a group of productive or profit-making enterprises or organizations that have a similar technological structure of production and that produce or supply technically substitutable goods, services, or sources of income . . . . [c] manufacturing activity as a whole . . . ." Webster's Third New International Dictionary. "Firm" is defined as "a business unit or enterprise. . . ." Id. Because both the plaintiffs and the defendants can find support for their claims in one or more of the definitions of the word "industry," resort to the dictionary for the purpose of resolving the statutory construction issue raised by this appeal is not particularly helpful.

virtually any business or commercial enterprise would qualify as an "industrial firm," including, for example, insurance companies, banks, private schools and colleges, hotels and restaurants, retail stores, apartment complexes, and the like. We do not think that the commonly approved usage of the term "industrial firm" includes these and other such business enterprises. By contrast, the term "industrial firm" more readily brings to mind commercial entities engaged in manufacturing activities.

Furthermore, several well established tenets of statutory construction provide persuasive support for the defendants' claim regarding the intended scope of the exemption created under § 20-340 (6). First, under the interpretation of the term "industrial firm" advanced by the plaintiffs, the word "industrial" has little, if any, significance because virtually any "firm"—that is, any "business unit or enterprise"[14]—would qualify for the exemption created under § 20-340 (6). In addition, under the plaintiffs' interpretation of "industrial firm," the exemption created by § 20-340 (9) for "employees of stage and theatrical companies" and the exemption under § 20-340 (10) for "employees of carnivals, circuses or similar transient amusement shows"[15] would be unnecessary because those persons already would be exempt from the statutory licensure requirements by operation of § 20-340 (6). "It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Citations omitted; internal quotation marks omitted.) *Castagno* v. *Wholean*, 239 Conn. 336, 346, 684 A.2d 1181 (1996); *Fleming* v. *Garnett*, 231 Conn. 77, 90–91, 646 A.2d 1308 (1994). In contrast to the plaintiffs' interpretation of § 20-340 (6), the

[14] See footnote 13 of this opinion.
[15] See footnote 9 of this opinion.

statutory construction advanced by the defendants gives full effect both to the word "industrial" and to each of the ten other exemptions created by the legislature under § 20-340.

Second, the plaintiffs also concede that under their construction of the term "industrial firm," only that class of persons performing plumbing services for the general public is likely to fall outside the scope of the exemption created by § 20-340 (6). If the legislature had intended to limit the statutory licensure requirement in such a manner, it easily could have done so without creating the numerous exemptions set forth under § 20-340.[16] See, e.g., *LoPresto* v. *State Employees Retirement Commission*, 234 Conn. 424, 435, 451–52, 662 A.2d 738 (1995). The fact that the legislature eschewed that approach and, instead, crafted eleven specific exemptions to the licensure requirement suggests that it did not intend such a sweeping application of § 20-340 (6).

Finally, a primary purpose of the licensure requirement, in addition to establishing a uniform, statewide

[16] We note that the pertinent legislative history sheds little light on the meaning of the term "industrial firm" under § 20-340 (6). There is nothing in the relevant legislative debate, however, indicating an intent by the legislature to exempt service providers, as distinguished from firms engaged in manufacturing activities, from the licensure requirements. Indeed, the limited debate about the licensure requirements, which focuses almost exclusively on the applicability of those requirements to a firm engaged in industrial manufacturing and construction, arguably suggests a contrary conclusion. Specifically, Senator Morgan McGuire raised the following concern about the applicability of the licensure requirements to steamfitters: "[T]here are many industries in the state that have great numbers of electrical workers, for example, great numbers of steamfitters. . . . I know that at a place like [Electric Boat], a great portion of the personnel are steamfitters . . . . I do not think that this act should in any way, shape or form apply to those people who are engaged in industry doing the job as a part of an ultimate and later job . . . ." 11 S. Proc., Pt. 6, 1965 Spec. Sess., pp. 2187–88. In attempting to assuage Senator McGuire's concerns, Senator Paul Amenta, a proponent of the bill, reiterated that the provisions of the act "shall not apply to . . . employees of industrial firms, which Electric Boat would be . . . ." Id., p. 2189.

system of licensing, is to protect the public health and safety. See, e.g., 11 S. Proc., Pt. 6, 1965 Spec. Sess., p. 2186, comments by Senator Charles T. Alfano ("[w]e feel that [the electrical, plumbing, steamfitting and elevator repair] trades are of such a character that they are essential to the public health and safety, and they should be regulated on the state level"). As a remedial statute, we must afford it a liberal construction in favor of those whom the legislature intended to benefit. *Knight* v. *F.L. Roberts & Co.*, 241 Conn. 466, 474, 696 A.2d 1249 (1997); *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 237 Conn. 123, 133, 676 A.2d 369 (1996). "In furtherance of that principle, exemptions or exclusions are to be strictly construed." *Success Village Apartments, Inc.* v. *Local 376*, 175 Conn. 165, 168, 397 A.2d 85 (1978); *State Board of Labor Relations* v. *West Hartford Board of Education*, 177 Conn. 68, 74, 411 A.2d 28 (1979). Construing the term "industrial firm" to include virtually any commercial or business enterprise would be contrary to that principle. Indeed, the plumbing and piping work performed in a hospital is critical to the health and safety of its patients; as the defendants have explained, such work includes the installation and maintenance of water and gas lines for patient rooms, operating rooms, and laboratories and, therefore, it is likely the legislature intended those performing such work to meet the highest professional standards.[17] Moreover, the plaintiffs acknowledge that

---

[17] It is true that the hospital employs licensed plumbers who are responsible for supervising unlicensed persons in the performance of plumbing and piping work. Section 20-340 (6), however, contains no such requirement. Consequently, a business or commercial enterprise that is entitled to the exemption created under § 20-340 (6) need not employ *any* licensed plumbers.

The plaintiffs also maintain that there is no logical reason why the legislature would exempt persons employed by federal, state and municipal agencies from the statutory licensure requirements; see General Statutes § 20-340 (1); and not also exempt persons employed by private enterprises, like the hospital, which provide the same or similar services. We disagree. Contrary to the plaintiffs' contention, it was reasonable for the legislature

our determination regarding the scope of the exemption created under § 20-340 (6) for plumbing and piping work is equally applicable to the electrical, fire protection system, elevator repair and installation, and heating and cooling trades. Thus, under the statutory construction espoused by the plaintiffs, the hospital, and all other business or commercial entities that provide services to the public, would be allowed to employ unlicensed personnel to perform any or all of its electrical work; see General Statutes § 20-330 (2);[18] any or all of its elevator installation, repair and maintenance work; see General Statutes § 20-330 (7);[19] any or all of its heating, piping and cooling work; see General Statutes § 20-330 (5);[20] and any or all of its fire protection sprinkler

to entrust to each of those governmental entities the responsibility for regulatory oversight of its public agencies. The dissent argues that this reasoning is flawed because the state also is responsible for the regulatory oversight of some private agencies, as illustrated by the number of regulations that apply to hospitals. The dissent fails to acknowledge, however, that its proposed broad definition of service provider encompasses other service providers who are not as heavily regulated as hospitals, such as large corporations, insurance companies, restaurants, and private colleges. The lack of strict health and safety regulations affecting these businesses is all the more reason to believe that the legislature intended, as a minimal safety requirement, that the plumbers and electricians working on those buildings at least be licensed.

[18] General Statutes § 20-330 (2) provides in relevant part: " 'Electrical work' means the installation, erection, maintenance, alteration or repair of any wire, cable, conduit, busway, raceway, support, insulator, conductor, appliance, apparatus, fixture or equipment which generates, transforms, transmits or uses electrical energy for light, heat, power or other purposes . . . ." Although § 20-330 (2) has been amended since 1989, the time of the initial alleged violation; Public Acts 1990, No. 90-194, § 1; there are no relevant substantive changes for the purposes of this opinion.

[19] General Statutes § 20-330 (7) provides: " 'Elevator installation, repair and maintenance work' means the installation, erection, maintenance and repair of all types of elevators, dumb waiters, escalators, and moving walks and all mechanical equipment, fittings, associated piping and wiring from a source of supply brought to the equipment room by an unlimited electrical contractor for all types of machines used to hoist or convey persons or materials but does not include temporary hoisting machines used for hoisting materials in connection with any construction job or project . . . ."

[20] General Statutes § 20-330 (5) provides in relevant part: " 'Heating, piping and cooling work' means the installation, repair, replacement, maintenance

systems work. See General Statutes § 20-330 (9).[21] The significant additional public health and safety implications raised by a broad application of the exemption to those occupations militates strongly in favor of the less expansive interpretation of the term "industrial firm" urged by the defendants.

This case presents a good example of why the legislature, for purposes of granting exemptions under § 20-340 (6) from the licensure requirements of § 20-334, distinguished between firms engaged in manufacturing activities and firms engaged in other business or commercial pursuits. In the case of a firm or company involved in a manufacturing activity, the general public is unlikely to be affected by the plumbing and piping work performed at the manufacturing site. By contrast, faulty plumbing and piping poses a far greater public safety risk in the case of an enterprise that, like the hospital, provides services to the public. Moreover, manufacturing firms are far more likely than most other businesses to employ persons who, due to their mechanical and engineering training and skill, may be able to rectify problems arising from substandard plumbing and piping work performed by unlicensed personnel. Consequently, the legislature reasonably

or alteration of any apparatus for piping, appliances, devices or accessories for heating systems, excluding sheet metal work; air conditioning and refrigeration systems, boilers, including apparatus and piping for the generation or conveyance of steam and associated pumping equipment . . . ."

[21] General Statutes § 20-330 (9) provides in relevant part: " 'Fire protection sprinkler systems work' means the layout, on-site fabrication, installation, alteration or repair of any automatic or manual sprinkler system designed for the protection of the interior or exterior of a building or structure from fire, or any piping or tubing and appurtenances and equipment pertaining to such system including overhead and underground water mains, fire hydrants and hydrant mains, standpipes and hose connections to sprinkler systems, sprinkler tank heaters excluding electrical wiring, air lines and thermal systems used in connection with sprinkler and alarm systems connected thereto, foam extinguishing systems or special hazard systems including water spray, foam, carbon dioxide or dry chemical systems, halon and other liquid or gas fire suppression systems. . . ."

concluded that the need for licensed personnel is significantly less in the case of a firm engaged in manufacturing activities than it is for other business and commercial enterprises.

We conclude, therefore, contrary to the determination of the trial court, that the hospital is not an "industrial firm" within the meaning of § 20-340 (6). Accordingly, the plaintiffs are not exempt from the licensure requirements of chapter 393.

The judgment is reversed and the case is remanded with direction to dismiss the appeal.

In this opinion CALLAHAN, C. J., and BORDEN, J., concurred.

BERDON, J., dissenting. The decision of the majority unfortunately will have a substantial adverse impact on hospitals and other institutions by requiring them to employ licensed plumbers and other tradesmen in order to perform trivial tasks that are performed everyday by ordinary persons in their own homes. For example, the named plaintiff, Hartford Hospital (plaintiff), which, according to the majority, does not fall within the definition of "industrial firm" in General Statutes § 20-340 (6), will now be required to employ a licensed plumber to replace a faucet in a bathroom sink or, for that matter, to replace the washer in the faucet.[1] The court's decision, applicable to providers of services, such as hospitals, private educational institutions, corporate

---

[1] The nature of the plumbing duties that were at issue in this case is best described by reference to the declaratory ruling of the state plumbing and piping work examining board (board), which includes the following statement: "The aforesaid duties, which [the plaintiff] avers should not require a license, include:

"(a) Maintenance of leaky sinks and drains, and packing of faucets;

"(b) Replacement of valves to correct running toilets;

"(c) Maintenance/replacement of shower heads, hoses and nozzles;

"(d) Maintenance of kitchen garbage disposals;

"(e) Replacement of vacuum breakers on sinks; and

complexes and the like, will not only result in increased labor costs, but also, decreased maintenance services during periods when the economy is robust and skilled labor is scarce.

The plaintiff argues that it is exempt from the statutory licensing requirements[2] with respect to plumbing work pursuant to § 20-340 (6) because it falls within the definition of industrial firm. Section 20-340 (6) provides an exemption for "employees of industrial firms whose main duties concern the maintenance of the electrical, plumbing and piping, solar, heating, piping and cooling, or elevator installation, repair and maintenance work of such firm on its own premises or on premises leased by it for its own use . . . ." In construing this exemption, we are required to look "to the words of the statute itself, to the legislative history and circumstances surrounding its enactment"; (internal quotation marks omitted) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431, 692 A.2d 742 (1997); and to the legislative scheme in which the exemption is set forth. *Conway* v. *Wilton*, 238 Conn. 653, 663–64, 680 A.2d 242 (1996). We are also required to use our "common sense" and "assume that [the legislature intended to accomplish] a reasonable and rational result . . . ." (Internal quotation marks omitted.) *Caltabiano* v. *Planning & Zoning Commission*, 211 Conn. 662, 667, 560 A.2d 975 (1989). I conclude that the majority, by narrowly defining the term industrial firm as one engaged only in manufacturing activities, does nothing to advance the legislative scheme of protecting the consuming public, but, rather, unnecessarily adds costs to vital services required by the public.

---

"(f) Maintenance and/or unplugging of plaster traps."

The board ruled that "[a]ll the stated plumbing-related duties involve the performance of plumbing work," and that a license was required to perform such work.

[2] See footnote 5 of the majority opinion for the text of General Statutes § 20-334, which sets forth the licensing requirements.

I begin my analysis with the language of the statute. The defendants, the state department of consumer protection and the state plumbing and piping work examining board do not contest that the plaintiff is clearly a "firm" under any definition of the term, and thus the inquiry is whether a hospital is "industrial" in order to satisfy the requirement for an exemption under § 20-340 (6). The majority concludes that a service provider, like a hospital, does not fit within the "commonly approved usage of the term 'industrial firm' " because that term "more readily brings to mind commercial entities engaged in manufacturing activities." The dictionary definition of industry, however, includes reference to both manufacturing concerns and providers of services.[3] It is an established rule of construction that we not only use our common sense, but "[w]here a statute does not define a term, it is appropriate to look to the common understanding expressed . . . in dictionaries." *Doe* v. *Manson*, 183 Conn. 183, 186, 438 A.2d 859 (1981). Moreover, service businesses, such as insurance, health care, credit and banking, are commonly referred to as industry. Thus, the term "industrial firm" is not restricted to manufacturing activities in its common usage.[4]

---

[3] Webster's Third New International Dictionary defines industry in relevant part as: "3a: systematic labor esp[ecially] for the creation of value . . . b: a department or branch of a craft, art, business, or manufacture: a division of productive or profit-making labor; esp[ecially]: one that employs a large personnel and capital esp[ecially] in manufacturing . . . c: a group of productive or profit-making enterprises or organizations that have a similar technological structure of production and that *produce or supply technically substitutable goods, services or sources of income* . . . ." (Emphasis added.)

[4] The majority mistakenly argues that the plaintiff's construction of General Statutes § 20-330 (2), which defines the term "electrical work," would allow "all commercial entities" to employ unlicensed personnel to perform its electrical work, and any or all of its elevator installations. The simple response to this argument is that by requiring that the § 20-340 (6) exemption apply only to "*employees* . . . whose *main duties* concern the maintenance of . . . [plumbing and other services] on its own premises," the legislature insured (1) that industrial firms cannot contract for those "dangerous"

I also find support for exempting the plaintiff from the licensing requirements in the legislative history and circumstances surrounding the enactment of General Statutes § 20-334. The primary purpose of the licensing requirement in § 20-334[5] was to protect the general consuming public from unqualified and/or unscrupulous contractors. Roswell Goodman, the executive director of Hartford Mechanical Contractors, Inc., testified before the legislative committee on General Law when it was considering the bill, which was subsequently codified as § 20-334, that "[n]ot only have we members of this industry, the people who work with the tools and the contractors to consider, but we have got to think about *the people who they are serving*, the public." (Emphasis added.) Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1965 Sess., p. 348. Robert Hartigan, appearing before the same committee on behalf of the Connecticut Light and Power Company, concurred that "the purpose [of § 20-334] is to protect the public and maintain certain minimum standards in competence to the public." Conn. Joint Standing Committee Hearings, General Law, Pt. 3, 1965 Sess., pp.

services with outside unlicensed contractors who may be unqualified, and (2) that in all probability employees performing such work would be part of a properly supervised maintenance staff whose main duties include maintaining the firm's plumbing and other services. (Emphasis added.) Furthermore, it is absurd to believe that a private service providing firm, like the plaintiff here, which must prove each year that it has systems and personnel in place to protect the health and welfare of its patients and personnel or risk losing its operating license; see Regs., Conn. State Agencies § 19-13-D3; would be more likely to allow one of its employees to install an elevator than would supervisors in a public school.

[5] Section 20-334 was also part of a legislative scheme to replace municipal licensing of skilled trades with a uniform statewide system of licensing. *White Oak Corp.* v. *Dept. of Consumer Protection*, 12 Conn. App. 251, 256, 530 A.2d 641 (1987). "Prior to 1965, occupational licensing of various trades in Connecticut was done by municipal ordinances promulgated under local law." Id.; see 61 S. Proc., Pt. 6, 1965 Sess., p. 2186, remarks of Senator Charles T. Alfano (statute designed "to eliminate the necessity of all these men in these trades going to every single community in the state and securing a license and paying a license fee in every town they go into").

1138–39. Hartigan commented further that, "*of course, [the licensing requirements of § 20-334] would not be applicable to our employees who do not work for the general public, but work for companies.*" (Emphasis added.) Id., p. 1139. Senator Paul Amenta confirmed this legislative purpose during debate on § 20-334 when he stated, "if a person works for an individual firm, [he is] not going to offer himself to the general public . . . ."[6] 61 S. Proc., Pt. 6, 1965 Sess., p. 2187. Furthermore, a review of the specific eleven exemptions in § 20-340 demonstrates that the legislature was concerned with creating a state licensing system for plumbers, electricians and heating and cooling technicians who come into *direct contact with the public*. For example, employees of "any federal, state or municipal agency," as set forth in subdivision (1), "employees of stage and theatrical companies," as set forth in subdivision (9), and "employees of carnivals, circuses or similar transient amusement shows," as set forth in subdivision (10), all of whom are exempt from the licensing requirements, do not hold themselves out to the public as being qualified to perform plumbing, electrical or heating and cooling services.

The majority argues that if § 20-340 (6) covers employees of the plaintiff, the exemptions created by § 20-340 (9) and (10) for employees of stage and theatrical companies and employees of carnivals, circuses or similar transient amusement shows "would be unnecessary because those persons already would be exempt

[6] The majority argues that service providing firms are not exempt under § 20-340 (6) because such an exemption would raise significant public health and safety implications. This argument is flawed because the exemption of municipal, state and federal employees, theater and carnival employees and manufacturing employees raises equally as significant public health and safety implications. Indeed, government facilities, entertainment facilities and large manufacturers serve the same number of members of the general public, if not more, than service providing firms.

from the statutory licens[ing] requirements by operation of § 20-340 (6)." According to the majority, if the legislature had wanted to limit the statutory licensing requirement to persons who perform services for the general public, "it easily could have done so without creating the numerous exemptions set forth under § 20-340," and the "fact that [it] eschewed that approach . . . [by creating eight more exemptions] suggests that it did not intend such a sweeping application of § 20-340 (6)."

I disagree with the majority's conclusion that the legislature did not intend a sweeping application of § 20-340 (6). The legislative history of No. 789, § 12, of the 1967 Public Acts, which added six licensing exemptions; now General Statutes § 20-340 (2), (3), (4), (5), (7) and (9);[7] indicates that the exemptions were listed with specificity because the act was "merely a technical amendment" of Public Acts, Spec. Sess., February, 1965, No. 493, § 9. 12 H.R. Proc., Pt. 2, 1967 Sess., p. 5376,

---

[7] Public Acts 1967, No. 789, § 12, added the following six exemptions to § 20-340: (1) "employees of industrial firms whose main duties concern the . . . fabrication of electrical, plumbing and piping, heating, piping and cooling . . . or elevator installation, repair and maintenance equipment used in the production of goods sold by [such] industrial firms"; (2) "employees of any municipal corporation specially chartered by the state of Connecticut"; (3) "employees of any contractor while said contractor is performing work for or subject to inspection by any federal, state or municipal agency or corporation other than a municipal building department, or any public service company"; (4) "persons engaged in the installation, maintenance, repair and service of electrical or other appliances of a size customarily used for domestic use where such installation commences at an outlet receptacle or connection previously installed by persons licensed to do the same and maintenance, repair and service is confined to the appliance itself and its internal operation"; (5) "persons performing work necessary to the manufacture or repair of any apparatus, appliances, fixtures, equipment or devices produced by it for sale or lease"; and (6) "employees of stage and theatrical companies performing the operation, installation and maintenance of electrical equipment if such installation commences at an outlet receptacle or connection previously installed by persons licensed to make such installation."

remarks of Representative Edwin A. Lassman. According to Lassman, the legislature simply wanted to redefine certain "occupational provisions," and redefine "areas [of Public Acts, Spec. Sess., February, 1965, No. 493, § 9] so that ambiguities could be cleared up in the various fields of licensing." Id. There is no indication from this history that the legislature wanted local plumbing enforcement officers to limit § 20-340 (6) to manufacturing firms.

I also disagree with the majority's conclusion that the legislature reasonably could have concluded that it was sound policy to exempt plumbers employed to work in state operated hospitals, such as the state veterans hospital, and elementary, junior high and senior high schools, while requiring employees of private service providers, such as the plaintiff, Yale New Haven Hospital, Trinity College and Wesleyan University, to be licensed before they can perform plumbing tasks. The exemption for employees of industrial firms was one of three exemptions in the original version of § 20-334. The other exemptions were those for employees of federal, state and municipal agencies (now § 20-340 [1]) and public service company employees (now § 20-340 [2]).[8] According to the majority, the legislature determined in 1965, that it was acceptable to have unlicensed plumbers work in state operated hospitals, where the plumbing work "is critical to the health and safety of [the] patients," and public schools, where thousands of young students in the state attend class and may use gas lines for basic laboratory work, but it

---

[8] Public Acts, Spec. Sess., February, 1965, No. 493, § 9, provides: "The provisions of [§ 20-334] shall not apply to persons employed by any federal, state or municipal agency, employees of public utilities regulated by the state public utility commission, or employees of industrial firms whose main duties concern the maintenance of the electrical, plumbing, steamfitting or elevator repair work of such firm for its own premises or those leased by it or the fabrication of electrical, plumbing, steamfitting or elevator equipment used in the production of goods sold by such industrial firms."

would not be acceptable to have unlicensed plumbers in private hospitals and schools. This distinction does not make sense. "[C]ompelling principles of statutory construction . . . require us to construe a statute in a manner that will not . . . lead to [such] absurd results." *Turner* v. *Turner*, 219 Conn. 703, 712–13, 595 A.2d 297 (1991).

The majority points to no legislative history to justify this untenable result. Instead, the majority assumes that there is some form of assurance of safety in private manufacturing firms and federal, state and municipal agencies that does not exist in private service providing firms. The majority argues, without any basis, that hospitals and other service providers are less likely than manufacturing firms to voluntarily employ licensed supervisory employees, who "may be able to rectify problems arising from substandard plumbing and piping work performed by unlicensed personnel." I disagree with this reasoning because private service providing firms, such as hospitals and schools, have the same incentive as manufacturing entities and public service providers to act with reasonable care and employ licensed supervisory persons—they both want to avoid any liability that could arise from allowing unlicensed plumbers to work without proper supervision. In fact, the plaintiff, like nearly every private hospital in the state, maintains a department of facilities and management, which ensures that its employees perform competent plumbing work under proper supervision.

The majority also argues that it is logical for the state to treat state agencies differently from private firms providing similar services because the legislature reasonably could have entrusted "each of those governmental entities [with] the responsibility for regulatory oversight of its public agencies." The flaw in this analysis is simple: state agencies are equally as responsible for regulatory oversight of private service providing

firms like hospitals as they are for public service providing firms. For example, pursuant to § 19-13-D3 (a) (1) and (2) of the Regulations of Connecticut State Agencies, which was adopted by the department of health prior to 1965 when the "industrial firm" exception was created, hospitals are required to provide adequate equipment for patient service, "in accordance with the requirements of the *state department of health*," and "the requirements of the *state fire safety code*." (Emphasis added.) Moreover, hospitals have to pass inspection of the *local fire marshall* each year in order to file their annual applications for operating licenses. Regs., Conn. State Agencies § 19-13-D3 (a) (2). Furthermore, "[a]reas in which explosive gases are used, and areas in which radioactive materials are used shall meet the requirements of the *state department of health* for adequate protection of patients and personnel." (Emphasis added.) Regs., Conn. State Agencies § 19-13-D3 (a) (3). Above all else, hospitals must ensure that "[t]he management, personnel, equipment, facilities, sanitation and maintenance of the hospital shall be such as reasonably to ensure the health, comfort and safety of the patients at all times." Regs., Conn. State Agencies § 19-13-D3 (h) (6) (now § 19-13-D3 [i] [7]). In light of the state's regulatory oversight of hospitals, it would have been unreasonable for the legislature to have concluded that public hospital employees who perform plumbing work, as opposed to private hospital employees who perform similar work, would be better supervised.[9]

I conclude that the plaintiff and its employees, the plaintiffs Herve Gelinas, Charles Rowe and Amrit Kalicharen, did not violate the statutory licensing provisions

[9] It is ironic to note that the majority concludes that the legislature reasonably could have entrusted supervision of transient amusement shows and carnivals to the state fire marshall, and to the requirement that such shows "comply with applicable municipal ordinances and regulations"; General Statutes § 20-340 (10); but that it could not have intended to allow hospitals, which are subject to more stringent regulations than traveling amusements,

of § 20-334 by performing plumbing and piping work on hospital premises without a certificate.

Accordingly, I would affirm the judgment of the trial court.

to employ unlicensed persons to perform plumbing tasks, like replacing a faucet in a bathroom sink, because that would subject the public to higher risks.