FELICIAN SISTERS OF ST. FRANCIS OF CONNEC-
TICUT, INC., ET AL. *v.* HISTORIC DISTRICT
COMMISSION OF THE TOWN OF ENFIELD
(SC 17931)

Rogers, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued September 21, 2007—officially released January 1, 2008

*Kenneth R. Slater, Jr.*, for the appellants (plaintiffs).

*Maria N. Stavropoulos*, senior assistant town attorney, with whom were *Mark J. Cerrato*, assistant town attorney, and, on the brief, *Christopher W. Bromson*, town attorney, for the appellee (defendant).

*Joshua A. Hawks-Ladds*, for the appellees (intervening defendant Anthony Troiano, Jr., et al.).

NORCOTT, J. The principal issue in this appeal is whether a town's historic district commission has jurisdiction over the parking lot of a private elementary school pursuant to General Statutes § 7-147d (d).[1] The plaintiffs, the Felician Sisters of St. Francis of Connecticut, Inc., and the Enfield Montessori School, Inc. (school), appeal[2] from the judgment of the trial court dismissing their administrative appeal from the decision of the defendant, the historic district commission of the town of Enfield (town),[3] denying their application for approval of a plan to replace a gravel parking area on their property with a newly constructed blacktop driveway and parking lot. We conclude that although the defendant had jurisdiction over the plaintiffs' parking area pursuant to § 7-147d (d), its denial of the plaintiffs' application was not supported by substantial evidence. Accordingly, we reverse the judgment of the trial court.

The record reveals the following facts and procedural history. The plaintiffs own property located at 1370 Enfield Street, also known as United States Route 5, in

[1] General Statutes § 7-147d (d) provides: "No area within an historic district shall be used for industrial, commercial, business, home industry or occupational parking, whether or not such area is zoned for such use, until after an application for a certificate of appropriateness as to parking has been submitted to the commission and approved by said commission. The provisions of this section shall apply to the enlargement or alteration of any such parking area in existence on October 1, 1973."

[2] The Appellate Court granted the plaintiffs' petition for certification to appeal from the judgment of the trial court; see General Statutes §§ 8-9 and 8-8 (o); and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The trial court, *Stengel, J.*, granted the motion of Anthony Troiano and Lillian Troiano, who own land adjacent to the plaintiffs' property, to intervene as party defendants in the administrative appeal, pursuant to General Statutes §§ 8-8 and 52-102 and Practice Book §§ 9-6 and 9-18. They have filed a memorandum adopting the defendant's brief in this appeal. All references herein to the defendant are to the historic district commission of the town.

the town's historic district.[4] A private elementary school has operated continuously on the property since 1965.[5] The property has two buildings in which classes are held, one known as the Graham Guest House, or the "white building," and the other known as Felician Hall, or the "brown building." The property presently has a straight two lane driveway, which leads 150 feet from Enfield Street past the white building to the brown building that is located at the rear of the property, with a small turnaround in front of the white building.

Historically, parking has been problematic on the plaintiffs' property because 50 percent of the school's student body comes from surrounding towns. Although there is paved parking for six cars adjacent to the brown building, parents lining up to drop off and pick up their children have been parking for many years on a grassy area located to the south of the white building, which the plaintiffs have since covered over with gravel to

_____

[4] According to the Enfield historic district ordinance, the historic district was established in 1972 pursuant to General Statutes § 7-147a et seq., to "promote the educational, cultural, economic and general welfare of the Town of Enfield through the preservation and protection of buildings and places of historic interest by the maintenance of such landmarks in the history of the Town, of the State, and of the Nation, and through the development of appropriate settings for such buildings and places . . . ." Enfield Historic District Ordinance § 1. The historic district consists of an approximately two mile long stretch of Enfield Street, bounded on the north by Route 190, and on the south by the intersections with Oliver Road and Old King Street. The historic district extends east and west from the state highway markers to the rear of the property lines of the properties located on either side of Enfield Street, but "in no event more than 250 feet" from those markers. Id., § 2.

[5] The two buildings on the site have been used continuously for educational purposes since 1944, when they housed the Our Lady of the Angels Academy, a girls' high school. By 1957, that high school was moved to a different facility, and the buildings were used for kindergarten students, with enrollment on the site peaking at 312 students in 1969. The kindergarten enrollment subsequently dwindled when the town's public schools introduced kindergarten classes. The Montessori school was founded in 1965 with a class of nineteen preschool children, and has grown to its current enrollment of approximately 120 students.

make it more stable for use in inclement weather.[6] The existing driveway and parking area has 12,413 square feet of blacktop and 6912 square feet of gravel, for a total of 19,325 square feet devoted to parking and vehicular use. Although the addition of the gravel parking area has somewhat alleviated problems caused by traffic overflowing onto Enfield Street, Stephen Mitchell, a traffic engineer, opined that the existing parking area remains troubled because it is "poorly defined," and gets crowded and blocked by the school vans and cars that must make multiple turns and maneuvers to exit the site.

In order to alleviate the parking and traffic problems on their property, the plaintiffs decided to redesign and rebuild the driveway and parking area. They propose building a new blacktop driveway that would lead from Enfield Street to a larger turnaround in the back of the property, with spatial capacity for seventeen cars on that loop located southwest of the white building and north of the brown building. After the new parking area is constructed, the plaintiffs will replace the existing gravel parking area with grass and newly planted trees, which would result in all of the parking being located in an area that is out of the view of Enfield Street. This proposal will result in 16,546 square feet of the plaintiffs'

[6] The town's zoning enforcement officer considered the addition of the gravel parking area to violate its zoning regulations, and issued two cease and desist orders to the plaintiffs. The town's zoning board of appeals subsequently ruled that the plaintiffs' gravel parking area was lawful. The town's planning and zoning commission appealed from that ruling to the trial court, which dismissed that appeal after concluding that the parking on the grassy area was a legal, preexisting, nonconforming use, and also that the addition of the gravel to that grassy area was not an illegal expansion of that use. See generally *Planning & Zoning Commission* v. *Zoning Board of Appeals*, Superior Court, judicial district of Hartford, Docket No. CV 054008771 (September 26, 2006). The town did not seek further appellate review of the trial court's ruling in that case.

property being devoted to parking and vehicular traffic, all of which will be surfaced with blacktop.[7]

To implement their plan, the plaintiffs applied to the defendant for a certificate of appropriateness pursuant to § 7-147d (d).[8] See footnote 1 of this opinion. Following a public hearing held pursuant to General Statutes § 7-147e[9] on July 28, 2004, the defendant's five members

[7] This proposal is the plaintiffs' third plan for the redesign of their parking area. Their first plan included fifty-five parking spaces and 27,677 square feet of blacktop, and was rejected by the defendant in 2002. The plaintiffs subsequently reduced the plan to thirty-seven spaces with 25,162 square feet of blacktop, and further diminished it to the current proposal of seventeen spaces with 16,546 square feet of blacktop.

[8] The plaintiffs applied for the certificate of appropriateness despite their continued belief that the defendant lacks jurisdiction over their parking area under § 7-147d (d). They nevertheless submitted their application because they believe that their "proposal improves the site from an historical protection standpoint," and "also addresses public safety by improving safe access and egress of parents and faculty to the site." When the issue was raised at the public hearing, the town's counsel advised the defendant that it had jurisdiction over the plaintiffs' application, and the plaintiffs' counsel noted that they reserved their rights to raise that issue as necessary in subsequent court proceedings.

[9] General Statutes § 7-147e provides: "(a) The historic district commission shall hold a public hearing upon each application for a certificate of appropriateness unless the commission determines that such application involves items not subject to approval by the commission. The commission shall fix a reasonable time and place for such hearing. Notice of the time and place of such hearing shall be given by publication in the form of a legal advertisement appearing in a newspaper having a substantial circulation in the municipality not more than fifteen days nor less than five days before such hearing.

"(b) Unless otherwise provided by ordinance, a majority of the members of the commission shall constitute a quorum and the concurring vote of a majority of the members of the commission shall be necessary to issue a certificate of appropriateness. Within not more than sixty-five days after the filing of an application as required by section 7-147d, the commission shall pass upon such application and shall give written notice of its decision to the applicant. When a certificate of appropriateness is denied, the commission shall place upon its records and in the notice to the applicant the reasons for its determination, which shall include the bases for its conclusion that the proposed activity would not be appropriate. In the notice to the applicant the commission may make recommendations relative to design, arrangement, texture, material and similar features. The commission may issue a certificate of appropriateness with stipulations. Evidence of approval,

voted unanimously to deny the plaintiffs' application on the ground that it did not qualify for a certificate of appropriateness under General Statutes § 7-147f[10] because, inter alia, the added pavement diminished the historic character of the property and the surrounding area.

The plaintiffs appealed from the denial of the certificate of appropriateness to the trial court pursuant to

as referred to in section 7-147d, shall be by certificate of appropriateness issued by the commission. Failure of the commission to act within said sixty-five days shall constitute approval and no other evidence of approval shall be needed."

[10] General Statutes § 7-147f provides: "(a) If the commission determines that the proposed erection, alteration or parking will be appropriate, it shall issue a certificate of appropriateness. In passing on appropriateness as to exterior architectural features, buildings or structures, the commission shall consider, in addition to other pertinent factors, the type and style of exterior windows, doors, light fixtures, signs, above-ground utility structures, mechanical appurtenances and the type and texture of building materials. In passing upon appropriateness as to exterior architectural features the commission shall also consider, in addition to any other pertinent factors, the historical and architectural value and significance, architectural style, scale, general design, arrangement, texture and material of the architectural features involved and the relationship thereof to the exterior architectural style and pertinent features of other buildings and structures in the immediate neighborhood. No application for a certificate of appropriateness for an exterior architectural feature, such as a solar energy system, designed for the utilization of renewable resources shall be denied unless the commission finds that the feature cannot be installed without substantially impairing the historic character and appearance of the district. A certificate of appropriateness for such a feature may include stipulations requiring design modifications and limitations on the location of the feature which do not significantly impair its effectiveness. *In passing upon appropriateness as to parking, the commission shall take into consideration the size of such parking area, the visibility of cars parked therein, the closeness of such area to adjacent buildings and other similar factors.*

"(b) In its deliberations, the historic district commission shall act only for the purpose of controlling the erection or alteration of buildings, structures or parking which are incongruous with the historic or architectural aspects of the district. The commission shall not consider interior arrangement or use. However, the commission may recommend adaptive reuse of any buildings or structures within the district compatible with the historic architectural aspects of the district." (Emphasis added.)

General Statutes § 7-147i.[11] The trial court, *Hon. Samuel Freed*, judge trial referee, first rejected the plaintiffs' claim that the defendant lacked jurisdiction over their parking area, concluding that the phrase "occupational parking" as used in § 7-147d (d) encompasses parking for private elementary schools. The trial court next concluded that the defendant did not act illegally, arbitrarily or in abuse of its discretion when it denied the plaintiffs' application because there was "ample evidence that the additional parking and driveway were not appropriate for the historic district," including the additional blacktop coverage, the fact that the parking is closer to the adjacent historic buildings and would result in some loss of landscaping, and the comments of an intervening defendant, Anthony Troiano, an adjacent property owner. See footnote 3 of this opinion. After denying the plaintiffs' motion for reargument and reconsideration, the trial court rendered judgment dismissing their administrative appeal. This certified appeal followed. See footnote 2 of this opinion.

On appeal, the plaintiffs claim that the trial court improperly concluded that: (1) parking for a private elementary school constitutes "occupational parking" under § 7-147d (d); and (2) the defendant did not act arbitrarily, illegally or in abuse of its discretion. We address each claim in turn.

---

[11] General Statutes § 7-147i provides: "Any person or persons severally or jointly aggrieved by any decision of the historic district commission or of any officer thereof may, within fifteen days from the date when such decision was rendered, take an appeal to the superior court for the judicial district in which such municipality is located, which appeal shall be made returnable to such court in the same manner as that prescribed for other civil actions brought to such court. Notice of such appeal shall be given by leaving a true and attested copy thereof in the hands of or at the usual place of abode of the chairman or clerk of the commission within twelve days before the return day to which such appeal has been taken. Procedure upon such appeal shall be the same as that defined in section 8-8." See also *Figarsky* v. *Historic District Commission*, 171 Conn. 198, 202, 368 A.2d 163 (1976) ("[p]rocedure upon an appeal from any decision of a historic district commission is the same as that for appeals from zoning boards").

I

The plaintiffs' first claim on appeal is that the trial court improperly concluded that the defendant had jurisdiction over their application on the ground that parking for a private elementary school constitutes "occupational parking" under § 7-147d (d). Specifically, they argue that " 'occupational parking' " is one of "several categories of regulated parking areas associated with business and industry," and urge us to reject the broader reading adopted by the trial court that "include[s] a variety of land uses unrelated to business and industry such as schools, churches, museums and buildings or recreational facilities used or maintained by the state or local government where at least one person using the parking area is employed at the site." The plaintiffs also contend that, in concluding that parking for private elementary schools is subject to the historic district statutes, the trial court improperly considered the exemption of institutes of higher education set forth in General Statutes § 7-147k (b),[12] and read the statute too broadly because "all land uses, save residential uses, involve some persons that are employed to perform a service at the property," which would render the "remaining list of commercial and industrial land uses . . . meaningless . . . ."[13] Finally, the plaintiffs contend that their school's tax-exempt, nonprofit status distinguishes it from the other "categories of business and industry contained in the statute."

In response, the defendant relies on the plain meaning of the statutory language and contends that the trial

---

[12] General Statutes § 7-147k (b) provides: "The provisions of this part shall not apply to any property owned by a nonprofit institution of higher education, for as long as a nonprofit institution of higher education owns such property."

[13] The plaintiffs also contend that the parking would not be "occupational parking," were it to be limited to visitors to the school, rather than made available to the faculty or staff.

court properly construed § 7-147d to cover "any kind of income producing enterprise or occupation . . . ." The defendant further argues that the higher education exemption contained in § 7-147k (b) demonstrates that, had the legislature wished to relieve private elementary schools from historic district regulation, it could have done so. We agree with the defendant.

"Issues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citations omitted; internal quotation marks omitted.) *Alvord Investment, LLC* v. *Zoning Board of Appeals*, 282 Conn. 393, 401–402, 920 A.2d 1000 (2007). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Alexson* v. *Foss*, 276 Conn. 599, 605, 887 A.2d 872 (2006).

We begin, as always, with the language of the statute. Section 7-147d (d) provides in relevant part: "No area

within an historic district shall be used for industrial, commercial, business, home industry or *occupational* parking, whether or not such area is zoned for such use, until after an application for a certificate of appropriateness as to parking has been submitted to the commission and approved by said commission. . . ." (Emphasis added.) General Statutes § 1-1 (a) requires that, "[i]n the absence of any statutory definition," we construe the term at issue "in accordance with 'the commonly approved usage of the language . . . .' " *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 665, 916 A.2d 803 (2007). The expansiveness of the word at issue, "occupational," is demonstrated by reference to various dictionaries,[14] which indicate great breadth in its definition as the adjective form of the word "occupation." See American Heritage College Dictionary (4th Ed. 2002) ("[O]ccupation" is "[a]n activity that is one's regular source of livelihood; a vocation. An activity engaged in esp[ecially] as a pastime; an avocation."); Merriam-Webster's Collegiate Dictionary (10th Ed. 2001) (defining "occupation" in relevant part as: "1a. an activity in which one engages <in the first three grades learning to read is perhaps the major ~ of the pupil—J.B. Conant> b. the principal business of one's life: vocation").

Under § 1-2z, the ambiguity determination is not limited to the statute itself, but requires us to view the statute at issue in the context of other related statutes. Our analysis of those statutes indicates that § 7-147d (d) plainly and unambiguously encompasses parking for private elementary educational facilities because the legislature drafted the statute with language clearly intended to subject a broad variety of nonresidential

[14] "If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Historic District Commission* v. *Hall*, 282 Conn. 672, 679–80, 923 A.2d 726 (2007).

parking uses to historic district regulation. Specifically, § 7-147d (d) requires certificates of appropriateness for "industrial, commercial, business, home industry or occupational parking" within the historic district. The definitions of the words "industrial," "commercial" and "business" encompass activities that involve the manufacture or sale of goods or services. For example, "commercial" is the adjective word form of "commerce," which is "the buying or selling of goods, esp[ecially] on a large scale, as between cities or nations." American Heritage College Dictionary, supra. "Industrial" is the adjective form of "industry," which is the "commercial production and sale of goods," or "the sector of the economy made up of manufacturing enterprises."[15] Id. The term "business" is broader and is defined as: "1a. The occupation, work or trade in which a person is engaged. b. A specific occupation or pursuit. 2. Commercial, industrial, or professional dealings. 3. A commercial enterprise or establishment." Id. Finally, the word "occupational," which is at issue in this case, has even greater breadth, and it is defined as the adjective form of "occupation," which is "[a]n activity that is one's regular source of livelihood; a vocation. An activity engaged in esp[ecially] as a *pastime; an avocation*." (Emphasis in original.) Id.

In our view, a reading of the word "occupational" that restricts it strictly to for-profit commercial or industrial uses would render these other words in § 7-147d (d) unnecessary surplusage, which would violate the "basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a

---

[15] See also *Hartford Hospital* v. *Dept. of Consumer Protection*, 243 Conn. 709, 718, 707 A.2d 713 (1998) (hospital employees performing plumbing work not subject to "industrial firm" licensure exemption under General Statutes § 20-340 [6] because that "term . . . more readily brings to mind commercial entities engaged in manufacturing activities").

purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *Small* v. *Going Forward, Inc.*, 281 Conn. 417, 424, 915 A.2d 298 (2007). Put differently, "[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ."[16] (Internal quotation marks omitted.) *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 426, 815 A.2d 94 (2003).

Moreover, it is well settled that "the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires [this court] to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Internal quotation marks omitted.) *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 238–39, 915 A.2d 290 (2007). Thus, the legislature's enactment of § 7-147k (b), which exempts from the provisions of the historic district act "any propert[ies] owned by a nonprofit institution of *higher education,* for as long as a nonprofit institution of higher education owns such property," further supports a construction of § 7-147d (d) subjecting the plaintiffs to the jurisdiction of the defendant. (Emphasis added.) "[W]e con-

---

[16] Moreover, even if we were to consider "occupational" as synonymous with "commercial," the defendant properly points out that courts have concluded that even nonprofit private schools qualify as commercial land uses. See, e.g., *Brown* v. *St. Venantius School*, 111 N.J. 325, 329, 544 A.2d 842 (1988) (parochial school is subject to state's common-law premises liability rule that "commercial landowners are responsible for maintaining, in reasonably good conditions, sidewalks abutting their property and are liable to pedestrians injured as a result of their negligent failure to do so").

sider the tenet of statutory construction referred to as expressio unius est exclusio alterius, which may be translated as the expression of one thing is the exclusion of another. . . . [W]here express exceptions are made, the legal presumption is that the legislature did not intend to save other cases from the operation of the statute." (Citations omitted; internal quotation marks omitted.) *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, 236 Conn. 453, 476, 673 A.2d 484 (1996) ("[B]y exempting only the [Reserve Officers' Training Corps] from the Gay Rights Law, the presumption is that the legislature did not intend to excuse the law school from complying with the Gay Rights Law by assisting the military in its recruitment activities. Had the legislature wanted to excuse state schools from complying with the Gay Rights Law, it could have included such a provision."); see also *Colangelo* v. *Heckelman*, 279 Conn. 177, 191, 900 A.2d 1266 (2006) ("[h]aving placed a specific limitation on the universe of accidents that fall within [the motor vehicle exception to the workers' compensation rule providing no cause of action against a fellow employee], we may presume, in the absence of evidence to the contrary, that the legislature did not intend to limit the exception further by excluding other classes or categories of accidents from its purview"). Put differently, the enactment of § 7-147k (b) indicates that the legislature, when it desires to do so, knows how to exempt specific kinds of educational institutions from historic district regulation.

Accordingly, we agree with Professor Terry J. Tondro's reading of § 7-147d (d), namely, that "[a]reas within the [historic] district cannot be used for parking, other than residential, without a [c]ertificate from the commission." T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) p. 355. Accordingly, we conclude that parking for the plaintiffs' private elementary school is "occupational parking" under § 7-147d (d), and that

the defendant, therefore, had jurisdiction over the plaintiffs' application for a certificate of appropriateness.

## II

Having concluded that the defendant properly exercised its jurisdiction over the plaintiffs' application, we next turn to their attack on the merits of its decision. The plaintiffs claim that the defendant abused its discretion because its decision to deny the certificate of appropriateness was not supported by substantial evidence. Specifically, the plaintiffs contend that the defendant's stated bases for the denial—namely, the loss of landscaping, an increase in paved space devoted to vehicles, that the parking placement would "diminish the main historic structure," and the concerns by members of the public in attendance—lack factual support in the record.[17]

In response, the defendant contends that it properly considered the four factors set forth by § 7-147f (a); see footnote 10 of this opinion; when it evaluated the appropriateness of the plaintiffs' proposed parking area. The defendant argues further that whether the proposed parking area is a safety and design improvement is not relevant to the inquiry guided by the factors set forth in § 7-147f (a). The defendant also contends that the plaintiffs' parking plan in essence fixes a problem that is only of their own making, namely, the allegedly illegal gravel parking area; see footnote 6 of this opinion; and that the plan is inappropriate because it

[17] The plaintiffs argue further that there is no evidence in the record that their proposal to move the blacktop parking area would do anything other than "improve the historic character of the site and district," and that the "only evidence of record in opposition to the application involved an overt effort of the neighbors to eliminate the school and existing parking associated with the school from the site altogether. No evidence demonstrated that there is historic significance to the grassy area along the rear boundary of the historic district that would be impacted by the placement of ten new parking spaces."

increases the size of the blacktop parking area, as well as the visibility of cars from the adjacent property and from the plaintiffs' own buildings, and moves the parking area closer to the historic buildings. Citing public comments of the plaintiffs' neighbors, and the "other similar factors" element of § 7-147f (a), the defendant states that "[a]n advanced degree in historic preservation is not necessary to conclude that expanses of macadam in an historic property do not conjure up an appropriate vista for the historic district." We agree with the plaintiffs.

"Procedure upon an appeal from any decision of a historic district commission is the same as that for appeals from zoning boards. General Statutes § 7-147i. The controlling question which the trial court had to decide was whether the historic district commission had acted, as alleged in the appeal, illegally, arbitrarily and in abuse of the discretion vested in it." *Figarsky* v. *Historic District Commission*, 171 Conn. 198, 202, 368 A.2d 163 (1976). In reviewing the correctness of administrative decisions, such as those by zoning or historic district commissions, it is well settled that, "[i]n appeals from administrative zoning decisions . . . the decisions will be invalidated even if they were reasonably supported by the record, if they were not supported by substantial evidence in that record. . . . In an appeal from the decision of a . . . [commission], we therefore review the record to determine whether there is factual support for the [commission's] decision . . . . Should substantial evidence exist in the record to support any basis or stated reason for the . . . commission's decision, the court must sustain that decision."[18] (Citations omitted; internal quotation marks

---

[18] The parties agree that the substantial evidence test governs our review of the defendant's decision, despite this court's decision in *Figarsky* v. *Historic District Commission*, supra, 171 Conn. 202–203, stating that a court reviews the decision of a historic district commission to determine "whether the commission's decision is *reasonably supported* by the record." (Emphasis added.) Our more recent case law distinguishes, however,

omitted.) *Heithaus* v. *Planning & Zoning Commission*, 258 Conn. 205, 223–24, 779 A.2d 750 (2001). Although judicial review of land use decisions is deferential, it is by no means a rubber stamp, as "a court cannot take the view in every case that the discretion exercised by the local zoning authority must not be disturbed, for if it did the right of appeal would be empty . . . ." (Internal quotation marks omitted.) *Daughters of St. Paul, Inc.* v. *Zoning Board of Appeals*, 17 Conn. App. 53, 57, 549 A.2d 1076 (1988), quoting *Suffield Heights Corp.* v. *Town Planning Commission*, 144 Conn. 425, 428, 133 A.2d 612 (1957).

Accordingly, we now turn to a review of the proceedings and the defendant's stated reasons for denying the plaintiffs' application. After the defendant had finished taking evidence from the plaintiffs and hearing comments from the public, one member moved the approval

between land use commissions' administrative and legislative functions, and states that "[l]egislative decisions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. . . . In appeals from *administrative zoning decisions, by contrast, the decisions will be invalidated even if they were reasonably supported by the record, if they were not supported by substantial evidence* in that record." (Citation omitted; emphasis added; internal quotation marks omitted.) *Heithaus* v. *Planning & Zoning Commission*, 258 Conn. 205, 215, 779 A.2d 750 (2001); see also, e.g., *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 540–42, 525 A.2d 940 (1987) (applying substantial evidence standard to review administrative decision of inland wetlands agency). In the present case, the defendant's decision to deny the plaintiffs' application for a certificate of appropriateness on the basis of its consideration and application of the statutory criteria is administrative, rather than legislative, in nature. See *Heithaus* v. *Planning & Zoning Commission*, supra, 217 (zoning board deciding application for special permit "acts in an administrative capacity . . . [because its] function . . . [is] to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply" [internal quotation marks omitted]). Accordingly, our application of the "substantial evidence" standard in the present case is consistent with our more recent land use case law, and we, therefore, view the application of the "reasonably supported" standard as set forth in *Figarsky* as limited to judicial review of historic district commissions' legislative decisions.

of the application. The chairman, Richard Tatoian, framed the discussion by stating that "the issue that is before us is [whether] the proposed placement of the site improvements [is] appropriate for this site. And we are charged with considering the impact and appropriate location of the parking and paving on the property in relation to this particular property; that is, the property on which the improvements are to be placed, and the surrounding neighborhood and the whole district. The issue is to be judged by criteria that we are charged with legitimately considering and those factors in considering the appropriateness of parking are actually set forth in the [G]eneral [S]tatutes. They are the size of the parking area, the visibility of cars in the parking area, the closeness of the parking area or the parking lot to adjacent buildings and other similar factors. There are four criteria for consideration in approving any parking proposal. Those are the criteria and issues that we must consider and nothing else. Whether a building is to be placed at some future date is not in the purview of our consideration because we are charged with considering what has been proposed to us in this application and not other zoning issues."

The defendant's members then held a lengthy discussion about the plaintiffs' proposal,[19] after which Tatoian stated, "in summary, I believe that our charge is to

---

[19] The record reveals that none of the defendant's commissioners spoke in favor of the plaintiffs' plan prior to voting. Specifically, Commissioner Russell Meyer stated that the words "improve and enhance . . . are very strong words and I don't understand how you can add more than 4000 square feet of blacktop and call that an enhancement to the [d]istrict." Meyer stated that the location of the blacktop with respect to the property lines did not matter because the "increase in paved area . . . would diminish the main historical structure on the private site. It is a question now of where they can live with this knowing full well that what they're doing is covering a piece of historic property perhaps forever. I have difficulty accepting that."

Commissioner Roman Polaski stated that he did not "see anything that would really change my mind this time. My concern is if there is a larger driveway installed, there will be more cars and 480 cars a week now could

decide whether the proposed improvements on the site are appropriate for the site and using the criteria, the size of the parking area. The size of the proposed parking area is an increase of what is paved of about [25] percent. Another criteria is the visibility of cars. Well, on that issue, the visibility of cars would be decreased by the proposal. The cars would be less visible if the proposal were approved. Closeness to adjacent buildings—the proposed parking is closer to adjacent historical buildings than it is now. And these houses and buildings are of a significant nature in a sense that they are among the oldest buildings in the town. And other similar factors would be the loss of landscaping—that is, paving involves the covering of natural vegetation which would occur and the impact on the adjacent

probably increase to a larger amount and I do not think that is appropriate."

Commissioner Sonja Dean stated that she viewed the defendant as "charged with preserving the properties to the time that they were built and maintain the appropriate look and feel of the district. One of the biggest issues that I think was raised tonight was what is appropriate. [The plaintiffs' attorney] mentioned a couple of times that that was a concern and I think that is truly the central issue here. What I think is also a critical issue is the issue of improvement versus what is appropriate. I think they are not necessarily the same thing. Just to [cite] another historic preservation issue, look at the Liberty Bell. A number of years ago they patched the crack in the Liberty Bell saying it was an improvement. Well, it wasn't historically accurate and has since been deemed inappropriate and fixed. But I think that in a historic preservation sense, we need to look at what is appropriate for the long term health and preservation of the [d]istrict. In addition to that, as a homeowner in the [d]istrict, one issue that is a factor for me is that our property is in the time frame of changes that were made. Just because changes to a property were made a long time ago does not make them appropriate from a historical preservation standpoint. I can just cite examples within my own property. There were changes made to that property in the 1930s that are not by any stretch of the imagination appropriate to that building that was built in 1910. I think one of our challenges is to preserve the properties to the times that they were built. So if a house was built in 1950, it should be preserved to how it would look in approximately 1950 and also in keeping with the look and feel of the [d]istrict. If a house was built in 1720, it needs to be kept in mind as well. I think those are two important things to remember—that it's not only a time frame of an existing precedent of change, it's making sure that we make the right decision now for the historic preservation of the [d]istrict in the [t]own of Enfield."

buildings, the neighborhood and the entire [d]istrict. The additional paving would undoubtedly . . . have an impact on the site and the surrounding neighborhood, in my opinion." At that point, the defendant's members voted unanimously to deny the plaintiffs' application.

Although the defendant's decision in this case was guided by the proper statutory factors under § 7-147f, we conclude that its application of those factors was not supported by substantial evidence and, therefore, was an abuse of its discretion. As the trial court and the defendant noted, the defendant was required to "take into consideration the size of such parking area, the visibility of cars parked therein, the closeness of such area to adjacent buildings and other similar factors." General Statutes § 7-147f (a). With respect to the second factor, we agree with the defendant's conclusion that under the proposal, any parked cars would be less visible from the street than they presently are. We disagree, however, with the defendant's assessment of the first factor, namely, the size of the parking area. Although Commissioners Russell Meyer and Richard Tatoian correctly noted that the size of the *blacktop* parking area increased by 25 percent, they did not appear to acknowledge that the *overall* area of the property dedicated to the parking of vehicles *decreased* from 19,325 to 16,546 square feet with the elimination of the gravel that had covered the former grassy area.[20] Moreover, although the parking of the vehicles would be closer to the adjacent buildings, they nevertheless would be farther from the vantage point of the historic streetscape of Enfield Street. Finally, although Tatoian and the other commissioners objected to the removal of some natural vegetation, they did not acknowledge the addition of multiple new trees and other landscaping

---

[20] The defendant refers to the gravel parking area as an " 'eyesore' " of the plaintiffs' own making that "they expect the town to undo." It readily is apparent that the plaintiffs do not expect the town to "undo" their gravel lot, which previously was determined to be a lawful land use. See footnote

to the property that would shield the cars from public view. The defendant also did not find that any of the vegetation that would be removed has any historic value, or that the addition of the new trees and plantings would be inconsistent with the historic streetscape.

The record also reveals that the defendant and the trial court improperly relied on the comments of two nearby landowners, namely, Troiano and Patrick Crowley, because those statements either were irrelevant or lacking in factual support. Specifically, the defendant emphasizes Troiano's rhetorical question, namely, "Who in this room would like to wake up in the morning and find their neighbor's nice green lawn turned into an asphalt parking lot with light poles all over and a roadway for cars and buses?" Much of this statement lacks factual support in the record, as the added blacktop would replace mostly gravel, rather than grass, and the parking area would only add two ten foot high light poles to the property. Moreover, the remainder of Troiano's testimony is devoted to complaints about the operations of the school, specifically that it had installed what he viewed as an illegal gravel parking area, and his concern that approval of the plaintiffs' application would lead to the expansion of the school buildings.[21] Crowley's testimony similarly focused on

6 of this opinion. Rather, the plaintiffs seek only the defendant's permission to eliminate a present aesthetic and safety problem on their own.

[21] Troiano's testimony expressed his strong opinions about the plan, and the operation of the plaintiffs' school in general, as he stated that "there are no changes from the previously submitted plans which were denied by the [c]ommission. The parking, roadway, light poles, sidewalks, shrubbery— everything is the same. This constitutes a total disregard of the [c]ommission's previous decision to deny their application.

"The school refuses to accept the [c]ommission's ruling. It's like a teacher telling a child no. Why does the school continue to return again and again when they have been told the application is not appropriate for the . . . [h]istoric [d]istrict? Something is wrong here. There are rules and regulations people have to abide by and that means everyone. Who in this room would like to wake up in the morning and find their neighbor's nice green lawn turned into an asphalt parking lot with light poles all over and a roadway for cars and buses? I don't think anyone in this room would be pleased

his complaints about the gravel parking area and the

with that situation. This environmental effect changes the whole community and not just the neighbors to the school. Once this paving is accepted, no one can stop the school from fulfilling their intent to asphalt their backyard totally. This is their way of coming back through the back door to get the large addition to the school built. If you look at the plans, they are exactly the same in the [h]istoric [d]istrict. And, once this property is sold, for whatever reason, as many properties have been sold by various religious orders, it could be used for any purpose in the future. We would be stuck with that situation.

"The previously green lawn area south of the sisters' home which the school graveled over is a definite violation. Now the school is saying because they are correcting this violation, the [c]ommission should give them the parking they are applying for. Well, you don't correct a wrong with a wrong.

"Once this change is made, it is forever. Forever. The [d]istrict will be changed forever. It's a precedent that will be set and you will get more applications for the same thing. It's been stated time and time again. The school made their own problems. Last year the [school] had approximately— did they say 120 [students]? Well, I think it's a little more, but according to one of the teachers, it's more. When I was on the board in the early 1980s, there were 80 students. Yes, to answer the question that was asked. It has been increased—sizeably. Very much so or they wouldn't be having a problem. Or, if you have to, there are alternatives. Have the children board school buses at the Felician Sisters' parking lot and return them in buses to the lot back waiting for their parents across the street. Or lower the enrollment. Less students, less parents, less cars. That's what we do when we overcrowd things. We change.

"If you wish the school to grow as it has in the past, the most sensible thing to do is to find another location out of this [h]istoric [d]istrict to build a brand new beautiful school. Or do the most obvious thing. Use the empty buildings across the street owned by the Felician Sisters.

"The [h]istoric [d]istrict is our town's history and how we protect it is a reflection of how we feel about our ancestors, our community and our future generations. I strongly feel that any encroachment on the residential properties in this [h]istoric [d]istrict should be vigorously opposed by the [h]istoric [c]ommission."

After some subsequent discussion about changes in the school's enrollment, Troiano then stated further that the "last application was for an addition to the school and the [fifty-seven] parking spots were behind the school out of the [h]istoric [d]istrict. The application that's presented now is exactly the same if you match it with the one that was submitted in 2002. You will find that it's exactly the same in the [h]istoric [d]istrict. The only thing missing is the building and, in my opinion, in that the [plaintiffs'] attorney brought up the [fifty-seven] parking spots, after this situation is resolved, hopefully it is denied. If it is approved, the next application will be for the building that that's what's happening here. They are putting in

operation of the school, including the traffic safety conditions attendant to the narrowness of the proposed driveway and the continued need to transport the school's relatively large number of out-of-town students.[22] Finally, the defendant's reliance on the state-

the parking lot before the building because there's nothing in the area of the building—because they could have put the parking lot where the building is supposed to be but it's completely vacant. It's absolutely obvious what the intent here is. To get a parking lot so they can come in, bypass the [c]ommission and go to the zoning board. That's the intent. He brought it up. The [fifty-seven] parking spots are down to [seventeen]—of course they're down to [seventeen], there's no building—yet! But that's the next proposal and this property does not warrant a new building. If there's going to be increases, as Sister Anastasia says in time, move to where there is more room. There are constrictions on this property. It's only 240 [feet] wide and the rear is all wetlands. It's almost impossible to operate on this property with an increase in enrollment. And that's what's happened here. It's been stated that they have been back trying to find places to park cars. It's just impossible with this facility as it is now with a building in this condition. It should be moved. It's in a [h]istoric [d]istrict. As it was in the eighties, it was a cottage type school and was almost unnoticeable. The house looks like a house still but if they add the parking lot and a building, forever the historic district is going to have an edifice that they're going to be sorry for. Not today, but for the future generations. That's my feeling.

"The parking lot that they talked about that they reduced—because the building hasn't been proposed. If that building is introduced, the parking lot is not even sufficient to handle the people that that building will hold. On top of that, the school rooms haven't been addressed. They are fifty and sixty years old—some of them—wood floors and no air conditioning. I can't understand how they can put 120 people in those buildings. They're 5000 square feet—the annex—and the school, the white building that is supposedly a school, has had nuns living in it for the thirty years that I have been there. I don't know of any school in this town or anywhere that has people living in the school. So is it a school or isn't it? Is it a moot issue? Are we being held up here by [the plaintiffs'] attorney who's coming here and saying if you don't give me what I want, I'm going to court. Go to court. He should have gone to court before he came here. He's wasting our time.

"The town has the right to protect our historic district. We live here and we are going to be here. I'm going to spend the rest of my life here. I personally am not going to allow someone from out of town to come in and tell us how to run our district. That's my feeling. Thank you."

[22] Crowley testified that he saw the narrowed design of the driveway as creating traffic difficulties because it would make it difficult for buses to enter as cars exit. He also noted that he recalled that the defendant previously had denied the application of another property owner who wanted to build

ments of other neighbors, including Judith Stevens[23]

a new driveway to a home behind his house, and that "precedent" might lead to a "lawsuit for the town further on down the road" should the defendant approve the plaintiffs' application. Finally, Crowley spoke of safety issues on Enfield Street and stated that he drives on it every morning and that "[t]here are cars trying to pull on to Post Office Road and people jetting out of [the] . . . [s]chool. And believe me, I have sat and watched many close calls at that light. I haven't been involved because I turn on to Post Office Road but it's a very dangerous area up there. And if you're going to increase the size of the parking area, you're going to increase the traffic flow. I don't understand why you think it is going to be more safe to move the traffic down in the [h]istoric [d]istrict. If you move the traffic back further, it doesn't make any difference as far as traffic flow goes. The same cars are pulling in and out and it is still going to be very dangerous there. If you narrow that driveway, buses are going to have a very difficult time turning into there . . . . Now you have the big [sport utility vehicles]. If you have two [sport utility vehicles] there and you have one sitting there and another one trying to get in, they're not going to make it and it's going to cause a logjam on to Route 5. It's going to cause a serious backup there on to Route 5.

"Last but not least, as far as the numbers go way back when in the 1940s or 1950s or whatever we're talking about, I find it hard to believe there were that many cars pulling in there. But I understand now when my parents said they walked five miles to school both ways in the cold with no shoes on. . . . Back then, you have to admit there wasn't a lot of busing and everyone didn't have two or three cars like they have now. So I do believe that maybe they did have those numbers there but I do believe that was a lot of Enfield students there then too. I can't comment. I don't have the facts as far as this goes but a lot of the cars that are pulling in and out of there do have out-of-state license plates on them or are coming from other towns. Now, this town provides what they do provide as far as kindergarten goes. We do provide that. So, a lot of the people that are using the school, even though it's not prevalent to the [h]istoric [c]ommission, are not Enfield residents. And that is what I'm concerned about. I think that we should be worried about what happens in our town, preserve our historical district and keep it where it is now. *I also think that we should do away with that gravel area.*" (Emphasis added.)

[23] Stevens had sent a letter to the defendant that was read into the record, which stated that her " 'home was built before the Revolutionary War in 1773. In the early 1800s, it became a hotel and country tavern and was a welcome destination for weary travelers between Hartford and Springfield. I spent a lot of time researching the history of my home and take great pride in living in my neighborhood because of its historical significance. As the bridge between our past and present, the preservation of historical districts is extremely important to all of us. I feel very strongly against the application being submitted by the [plaintiffs] for new parking and a roadway

and Richard O'Brien, the chairman of the board of trustees of the Martha A. Parsons Trust House located across from the plaintiffs' property on Enfield Street,[24] also is misplaced because these statements similarly are nothing more than conclusory attacks on the plaintiffs' plan founded on their objections to the existing gravel area and the operation of the school.[25] These are areas

and find it to be in total disregard of the importance of preserving our historic district. It is unfortunate that because of the school's current increase in enrollment, they are facing space limitations but school enrollments have always fluctuated and always will. Therefore, their proposed permanent solution to what could be a fluctuating problem would change the face of our district and is, therefore, totally unacceptable to me. I urge you as the guardians of our Enfield [h]istoric [d]istrict to vote no on this application and ask that you include this letter in your minutes."

[24] O'Brien stated only that "[f]or the last two years, we have watched as the school has turned the lawn across from us just south of the white historic building from a grassy area to a gravel area. They are now, to my amazement, calling that an *established parking area*. It just simply is not true. 6900 square feet I believe was the square footage on that. *It is now an eyesore.* We are adamantly against it and I am here representing all seven trustees of the Martha [A.] Parsons [Trust] House." (Emphasis added.)

[25] This description also applies to the testimony of Esther Clark before the commission, who stated that when she and her husband "moved in in 1986, people did park on the lawn. . . . They parked, let their children off and then they left. It wasn't continuous parking along there. That line creeped closer and closer to the fence that distinguishes our property line and it became rutted, muddy and it just destroyed what grass there was. There seemed to be no respect for that area. Eventually, I remember when it was graveled. Now, like I say, we moved in in 1986 and it was after that the gravel was done. There was no preparation that I saw and it never occurred to me at that time that it was not an approved correction for that particular property. So that's just my comments about the gravel parking area. . . .

"My husband and I are soon transferring ownership of our home, the Ethan Pease [H]ome, to new people. They've already been made aware of the parameters that we live in when we live in a historic district. They know they need to respect and adhere to the rules. And our feeling is that there are 300 years of history right here on two miles of Enfield Street. We've all respected it. We need to continue to respect it. We've only owned it for a period of a few years—any one of us who lives here. And people will go on for 300 years. So we have to be careful that we don't allow things to happen which will set a precedent so that the historical value and the living history that we have is destroyed. I would, in all due respect, ask that the [plaintiffs] abandon their desire to put this parking lot in and look for some alternative. Thank you."

beyond the purview of the defendant under § 7-147f (a). See, e.g., R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 12:1, p. 379 ("[t]he commission can act only for the purpose of controlling the erection or alteration of buildings, structures or parking which are incongruous with the historic or architectural aspects of the district"). Put simply, the neighbors' statements do nothing to explain how the plaintiffs' parking plan is any more deleterious to the historic character of Enfield Street than is the existing parking situation, and fail to acknowledge that the plan would result in decreased visibility of parked cars from the historic Enfield Street streetscape. Because neighborly animosity and outcry are not, without more, factors for the defendant's consideration under § 7-147f (a), their testimony does not support the defendant's conclusion in this case. Accordingly, we conclude that the defendant's decision to deny the plaintiffs' application for a certificate of appropriateness was not supported by substantial evidence and, therefore, was an abuse of its discretion.

The judgment is reversed and the case is remanded to the trial court with direction to sustain the plaintiffs' administrative appeal.

In this opinion the other justices concurred.