******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

VERMONT MUTUAL INSURANCE COMPANY
*v.* BRUCE FERN, SR., ET AL.
(AC 37771)

Gruendel, Prescott and Bear, Js.*

*Argued January 7—officially released May 24, 2016*

(Appeal from Superior Court, judicial district of Fairfield, Hon. George N. Thim, judge trial referee.)

*A. Jeffrey Somers*, for the appellant (named defendant).

*Stuart G. Blackburn*, with whom was *Derek E. Donnelly*, for the appellee (plaintiff).

*Opinion*

BEAR, J. The defendant Bruce Fern, Sr., appeals from the judgment of the trial court in favor of the plaintiff, Vermont Mutual Insurance Company. The plaintiff brought this subrogation action against the defendant and his son, the defendant Bruce Fern, Jr.,[1] to recover damages resulting from a fire occurring on a residential property on November 6, 2011. The defendant argues that the court erred in determining that (1) the defendant owed a duty to the plaintiff's insured and (2) the defendant installed a boiler and was equally at fault with his son. We affirm the judgment of the trial court.

In its memorandum of decision, the court made the following findings of fact. The defendant and his son both work as contractors, although only the defendant is a registered improvement contractor. Although both had some prior experience in installing new boilers,[2] neither the defendant nor his son has the necessary occupational license to engage in plumbing and piping work or heating, piping, and cooling work.

Charles Loria (insured) was the owner of property located at 155 Twin Lanes Road in Easton (property), on which he possessed an insurance policy issued by the plaintiff. At the time of the fire, the insured's former wife, Elizabeth Loria (occupant), lived on the property with her children.[3] She told investigators subsequent to the fire that the defendant and his son had installed the boiler about a week before the fire occurred.

On the day of the installation, the defendant and his son arrived at the property, removed the old boiler, and installed the new boiler. The defendant was responsible for certain aspects of the installation of the new pipe connecting the boiler to the chimney. This work involved measuring the pipe, making the proper cuts, and installing the adapter[4] that connected the pipe and chimney into the masonry. When installing the chimney connector into the masonry, the defendant used a two-by-four board to knock the adapter into the chimney. He also held the pipe in place while his son affixed the adapter and the pipe to one another. No further action, such as the use of cement or strapping the pipe in place, was taken to secure the chimney connector into the chimney. The defendant did not read the installation manual for the boiler or speak with a building inspector about the applicable regulations governing the installation of the boiler. The defendant's son ignited the boiler, but failed to make any adjustments to the appliance as required by the manufacturer.

Approximately one week after the defendant and his son installed the boiler, the chimney connector became disconnected from the masonry.[5] As a result, exhaust gases from the boiler were directed onto the joists of the basement ceiling and, over time, generated sufficient heat to start the fire. From the basement, the

fire spread to other parts of the property, resulting in damages exceeding $350,000.

During the subsequent investigation into the fire, two potential causes were identified as causing the fire. First, the boiler had not been placed to the proper settings and adjusted as required during the initial installation; consequently, the boiler had been running improperly and accumulated a large amount of soot. Second, the chimney connector had not been cemented into the chimney or secured in place by a separate piece of equipment; consequently, it became dislodged from the chimney. One of the investigators stated that, if the chimney connector had been secured properly into the chimney, the connector would not have become disconnected due to the improper installation and adjustment of the burner.

In its amended complaint, the plaintiff asserted two theories for recovery: (1) the defendant and his son had acted negligently in installing the boiler (counts one and three); and (2) they had breached an implied covenant that all work would be performed in a workmanlike manner (counts two and four). Following a trial to the court, the court issued its memorandum of decision on February 26, 2015. Recounting the essentials of this chronology, the court found that both the defendant and his son had violated various statutes and regulations while installing the boiler. Consequently, the court held that the defendant and his son had acted negligently and violated an implied covenant that their work would be done in a workmanlike manner, their actions were the proximate cause of the fire, and they were equally at fault. Therefore, the court found in favor of the plaintiff on each count of its complaint. This appeal followed.

I

On appeal, the defendant primarily asserts that the court erred in finding that he owed a duty to the insured or the occupant. The defendant asserts that the resulting fire was unforeseeable to him because his role in installing the boiler was relatively limited. In making this argument, the defendant relies on the difference in the type and character of his work when compared to that of his son. In particular, the defendant asserts that his son was the contractor retained or engaged by the occupant, made the agreement to install the boiler, held himself out as having the necessary skill and expertise to install the boiler, and, thus, had the ultimate responsibility for verifying that the boiler was properly installed. The defendant frames his personal involvement much more narrowly, contending that he was merely a laborer or helper, rather than a subcontractor, and claims as support that he took direction from his son, was not paid for his labor, and never held himself out as having any skill whatsoever in boiler installation. We disagree.

We begin by noting that the defendant's argument appears to confuse the existence of a duty with the scope of that duty once one is found to exist;[6] thus, he blends together two separate concerns. "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty. . . . The issue of whether a duty exists is a question of law . . . which is subject to plenary review. We sometimes refer to the scope of that duty as the requisite standard of care." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 373, 119 A.3d 462 (2015).

"A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620 (1982). Although "[t]he ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised . . . [f]oreseeability in this context is a flexible concept, and may be supported by reasonable reliance, impeding others who might seek to render aid, statutory duties, property ownership or other factors." (Citation omitted; internal quotation marks omitted.) *Burns* v. *Board of Education*, 228 Conn. 640, 647, 638 A.2d 1 (1994), overruled on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 323, 101 A.3d 249 (2014).

In holding that the defendant was liable for the fire, the court did not engage in a separate analysis concerning whether it was foreseeable that a fire could occur. Instead, it relied on two groups of statutes and regulations that the defendant and his son contravened while installing the boiler. It first noted that although neither the defendant nor his son had the occupational license required by statute for this work, they wilfully engaged in this work and the fire was "[t]he harm that . . . the licensing requirement was designed to prevent." It also noted that certain codes and standards promulgated by the National Fire Protection Association (standards) had been incorporated into our law and were not followed by the defendant. Thus, in effect, the court analyzed duty as a question of negligence per se under these two groups of statutes and regulations.[7]

"Negligence per se . . . serves to superimpose a legislatively prescribed standard of care on the general standard of care. . . . A violation of the statute or regulation thus establishes a breach of duty when (1) the plaintiff is within the class of persons intended to be

protected by the statute, and (2) the injury is the type of harm that the statute was intended to prevent. . . . Although the plaintiff still must demonstrate the remaining elements of negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. [It] merely decide[s] whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 24–25, 60 A.3d 222 (2013).

"Generally, our courts have treated a statutory violation as negligence per se in situations in which the statutes or city ordinances at issue have been enacted for the purpose of ensuring the health and safety of members of the general public." (Internal quotation marks omitted.) *Shukis* v. *Board of Education*, 122 Conn. App. 555, 580, 1 A.3d 137 (2010). Our Supreme Court has held on prior occasions that legislative enactments that contain criminal penalties could qualify as the statutory predicate for negligence per se claims. See *Panaroni* v. *Johnson*, 158 Conn. 92, 100–102, 256 A.2d 246 (1969) (criminal penalty for violation of ordinance); *Munroe* v. *Hartford Street Railway Co.*, 76 Conn. 201, 204, 56 A. 498 (1903) (violation of ordinance misdemeanor punishable by fine).

"[I]n determining whether a duty of care is owed to a specific individual under a statute, the threshold inquiry . . . is whether the individual is in the class of persons protected by the statute." *Ward* v. *Greene*, 267 Conn. 539, 548, 839 A.2d 1259 (2004). "In determining the class of persons protected by a statute, we do not rely solely on the statute's broad policy statement. Rather, we review the statutory scheme in its entirety, including the design of the scheme as enacted." (Internal quotation marks omitted.) Id., 551.[8]

Turning first to the licensure requirements, General Statutes § 20-330 et seq., our Supreme Court has stated that "a primary purpose of the licensure requirement, in addition to establishing a uniform, statewide system of licensing, is to protect the public health and safety." *Hartford Hospital* v. *Dept. of Consumer Protection*, 243 Conn. 709, 719–20, 707 A.2d 713 (1998). In a dissenting opinion, Justice Berdon similarly stated that "[t]he primary purpose of the licensing requirement . . . was to protect the general consuming public from unqualified and/or unscrupulous contractors." Id., 726. Discussing the legislative history, he quoted one industry professional, who said that "the purpose of [General Statutes § 20-334] is to protect the public *and maintain certain minimum standards in competence to the public*." (Emphasis added; internal quotation marks omitted.) Id., 726, quoting Conn. Joint Standing Committee Hear-

ings, General Law, Pt. 3, 1965 Sess., pp. 1138–39.

Pursuant to § 20-334 (a), no person is allowed to perform any work covered in chapter 393 of the General Statutes unless they (1) possess a license in the covered occupation or work, or (2) have appropriately registered as an apprentice and are subject to the regulations governing that training. One such broad category requiring a license or permit is heating, piping, and cooling work.[9] General Statutes § 20-330 (5); see also Regs., Conn. State Agencies § 20-332-5. The requirement that a contractor working in this field must be appropriately credentialed is intended to ensure that the person performing the work has the requisite skill and knowledge within the trade, or is at the very least supervised by an individual with that skill and knowledge. See General Statutes §§ 20-333 and 20-334 (a).[10]

Persons engaging in work without having the necessary license pursuant to these provisions of the General Statutes may be subject to both criminal and civil consequences. As recognized by the court, wilfully engaging in work covered by chapter 393 without the necessary license or permit is a class B misdemeanor. General Statutes § 20-341 (a). Other subsections provide civil consequences by authorizing the appropriate board or the Commissioner of Consumer Protection to impose penalties on unlicensed individuals engaging in work that requires a license under chapter 393; see General Statutes § 20-341 (b); and by making violations of the provisions of this chapter a basis for a claim pursuant to the Connecticut Unfair Trade Practices Act.[11] See General Statutes § 20-341 (d).

Finally, we note that the legislature explicitly has defined circumstances where a license would not be required to engage in otherwise covered work; see, e.g., General Statutes § 20-340; and our Supreme Court has construed the exceptions strictly. See *Hartford Hospital* v. *Dept. of Consumer Protection*, supra, 243 Conn. 720. It is axiomatic that parties are presumed to know the law. *Provident Bank* v. *Lewitt*, 84 Conn. App. 204, 209, 852 A.2d 852, cert. denied, 271 Conn. 924, 859 A.2d 580 (2004). The activities of the defendant and his son do not fall within any of the exceptions to the licensure requirement, and, therefore, the owner of the home, whether the insured or the occupant, was within the class of persons intended to be protected by the licensure requirement.[12]

With respect to the type of harm covered by this statutory scheme, our Supreme Court has noted these requirements are intended to ensure an appropriate level of competence by individuals in the provision of certain services to the public. See *Hartford Hospital* v. *Dept. of Consumer Protection*, supra, 243 Conn. 720 (because nature of plumbing work in hospital is "critical to health and safety of patients" and because of greater public safety risks from faulty plumbing in entities pro-

viding services to the public, "it is likely that the legislature intended those performing such work to meet the highest professional standards"); see also id., 726 (*Berdon, J.,* dissenting) (statement in legislative history quoted by dissent that purpose of licensure statute is to maintain minimum standards of competence for public). The statutory focus on ensuring appropriate competence is unsurprising, as there is a foreseeable risk of harm to people and property from the improper installation, maintenance, or operation of many of the appliances involved in occupations and work covered by chapter 393. Cf. *State* v. *Salz*, 226 Conn. 20, 33–38, 627 A.2d 862 (1993) (affirming manslaughter conviction of electrician, whose wiring of neighbor's electric heater in violation of code provisions and failure to ensure necessary inspections resulted in fire and neighbor's death); *Reciprocal Exchange* v. *Altherm, Inc.*, 142 Conn. 545, 549–53, 115 A.2d 460 (1955) (affirming liability for servicers' negligent failure to determine cause of malfunctioning oil burner or warn owner to discontinue use of burner, which was factor in explosion); *Beauvais* v. *Springfield Institute for Savings*, 303 Mass. 136, 142, 20 N.E.2d 957 (1939) (improper installation of oil burner in commercial building resulted in explosion, which caused tenant's death); *Executive Board of Missouri Baptist General Assn.* v. *Campbell*, 275 S.W.2d 388, 392 (Mo. App. 1955) (failure to properly adjust electrodes in furnace burner resulted in explosion). Pursuant to the regulatory scheme adopted in Connecticut for heating and cooling licenses, a license seeker must demonstrate that he both has the necessary experience and training to qualify for the license that he seeks and possesses a baseline proficiency of knowledge through the examination itself. See footnote 11 of this opinion. Thus, a fire resulting from the improper installation of a heating apparatus by a statutorily unqualified individual would be one such harm that the licensing statutes were intended to prevent. Cf. *Hartford Hospital* v. *Dept. of Consumer Protection*, supra, 719.[13]

Second, the court found that standards 31 and 211, which have been incorporated into our state law,[14] specified the manner in which a chimney connector must be secured; a secure connection was required by these standards and the manufacturer's instructions; and the chimney connector was required to be clamped and cemented in place, but was not secured as required. Pursuant to the applicable regulations governing the installation of oil burners and provisions of our building code, a chimney connector must be firmly cemented to the masonry unless a thimble is used.[15] There was testimony at trial, however, that the preexisting concrete ring was not a thimble of the type required by standard 31,[16] and the defendant conceded at argument before this court that the installed pipe was not strapped, cemented, or secured as required by the applicable regulations. Thus, the defendant owed, and by

his own concession breached, a duty pursuant to these regulations, regardless of his role in the process. See *Buravski* v. *DiMeola*, 141 Conn. 726, 728–29, 109 A.2d 867 (1954) ("It is, of course, the rule that when a person violates a statute or an ordinance enacted for the protection of the public, he is guilty of negligence as a matter of law. . . . This rule applies even though the person is ignorant of the existence of the statute or ordinance. He is chargeable with knowledge on the theory that ignorance of the law excuses no one." [Citation omitted.]).

The defendant has presented no case law in support of his position that the injury was not foreseeable because he was acting merely as a laborer, rather than as a trained boiler installer. We reject his reliance on this position for several reasons. To begin, the court determined that the defendant's duty to the plaintiff's insured arose primarily under legislative enactments, not pursuant to the common-law duty to exercise due care. Any subsequent foreseeability analysis concerning the duty owed by the defendant under the statutory scheme, therefore, would focus on the party injured and the harm suffered; see *Ward* v. *Greene*, supra, 267 Conn. 555; and a defendant can be held liable even without actual knowledge that his actions violated any statute. See *Commercial Union Ins. Co.* v. *Frank Perrotti & Sons, Inc.*, 20 Conn. App. 253, 260, 566 A.2d 431 (1989) (defendant's argument that it was unaware that combustible liquid was in trash irrelevant when ordinance required it to separate out combustible materials).[17]

Further, we note that not all injuries that potentially might occur during the performance of work requiring an occupational license are outside the realm of ordinary knowledge and experience. See *Utica Mutual Ins. Co.* v. *Precision Mechanical Services, Inc.*, 122 Conn. App. 448, 456, 998 A.2d 1228 (expert testimony not necessary to demonstrate failure of licensed plumber to use reasonable care "in operating plumber's torch in vicinity of combustible materials"), cert. denied, 298 Conn. 926, 5 A.3d 487 (2010). Thus, even if we were to rely on the common-law test for determining the foreseeability of an injury,[18] we would conclude that the injury in this case was foreseeable. The defendant testified at trial that he knew that products such as the boiler frequently come with instruction manuals and that he was aware of the building codes and how to find out what those codes require.[19] If he had consulted either the instruction manual for the boiler or a building inspector, as he has done in the past when he had questions about the applicable codes, he would have been aware that the chimney connector here should have been cemented or otherwise secured into the flue.

Additionally, specialized knowledge and training are not required to know that the general purpose of a flue

or chimney is to carry heated gases away from a heat-generating source. See, e.g., Random House Webster's Unabridged Dictionary (2d Ed. 2001) (defining chimney as "a structure . . . containing a passage or flue by which the smoke, gases, etc., of a fire or furnace are carried off"). Indeed, the defendant testified that he did not need any instructions from his son to know that the chimney connector must be secured as much as possible. Because it is within the understanding of an ordinary person that improperly installing the chimney connector for an oil burner could lead to a fire, the court reasonably could have found that the risk of fire arising from an improperly secured chimney connector either was, or at the very least should have been, foreseeable to the defendant.[20] See *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 335, 107 A.3d 381 (2015) ("[as] long as harm of the general nature as that which occurred is foreseeable there is a basis for liability even though the manner in which the accident happens is unusual, bizarre or unforeseeable" [internal quotation marks omitted]); see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 373–74.[21]

## II

The defendant also claims that the court erred in determining that the defendant "installed a boiler" and was equally at fault with his son. We disagree.

"[Q]uestions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Burns* v. *Adler*, 158 Conn. App. 766, 802, 120 A.3d 555, certs. granted, 319 Conn. 931–32, 125 A.3d 205, 206 (2015).

In its memorandum of decision, the court presented the following account of the actions of the defendant and his son while installing the boiler: "The defendants worked nine hours together in the Loria residence on November 2nd or 3rd. They removed the old boiler and [chimney connector] and installed a new boiler and [chimney connector]. [The defendant] cut pipes and held them in place while his son soldered them together. Both worked on installing the [chimney connector]. [The defendant] connected the end of the metal pipe to the chimney, but did not cement it in place or otherwise fasten it to the chimney. He merely pounded it in place

with a wood board. He did not read the manufacturer's instruction booklet or check with a building inspector. His son turned on the oil-fired boiler, but did not make any adjustments to the burner motor as required by the manufacturer." It then found that "the fire was proximately caused by [the defendant and his son's] careless and improper installation of the boiler and [chimney connector]," and that they were equally at fault.

The defendant argues that the court erred in characterizing his participation and responsibility as equivalent to that of his son. The defendant notes that the court made no specific finding that the defendant's manner of inserting the pipe into the chimney was negligent, but "simply treat[ed] [the defendant] as having undertaken to install the boiler along with his son, and charge[d] [the defendant] with negligence in the overall improper installation of the boiler—the entire job. That conclusion is flawed, however, [insofar as it is based on the arguments that the defendant's] status with respect to the job was as a laborer" and "it was the responsibility of [the defendant's son] to ensure that the new boiler and all appurtenances were installed correctly." In making this argument, the defendant has alleged facts that the court did not find.

Although relying on certain facts throughout his brief that the court did not adopt in its memorandum of decision, the defendant points to no separate error in the court's findings beyond this particular characterization and presents no independent argument beyond his conclusory position that the role of his son before and during the installation of the boiler somehow neutralizes his own responsibility to act in compliance with the applicable statutory provisions and in exercise of due care. Further, the court's recitation of the work completed by the defendant and his son was an accurate, if truncated, recitation of the defendant's and his son's testimony at trial about their actions at the property in late 2011. Although the court did not discuss in detail the evidence showing that the defendant's son arranged many of the project's details prior to the day of the actual installation, both the defendant and his son presented similar accounts of their work at the property and used terms suggestive of joint efforts to describe their labor.[22] With respect to the installation of the chimney connector itself, it is undisputed that the defendant was responsible for preparing most of the piping for the chimney connector, reinstalled the end of the chimney connector into the flue, and held the pipes while his son affixed them to one another. The defendant's son testified that he was not actively supervising the defendant's work in this respect,[23] and the defendant testified that he did not need any direction to reinstall the chimney connector or to know that he had to make the connection as secure as possible. We also note that the court explicitly found that it was the defendant, not his son, who inserted the chimney

connector into the masonry and failed to properly affix it, and the defendant does not challenge this finding of fact.

Further, expert testimony offered at trial stated that the fire was caused by the improper adjustment of the boiler following its initial ignition by the defendant's son and the failure of the defendant to secure the chimney connector into the flue properly. These experts also testified, however, that the failure to secure the chimney connector properly into the chimney was primarily responsible for the fire or, at the very least, that the fire would have been significantly less likely to occur, even with the improper adjustment of the boiler settings, if the connector had been secured properly. Thus, despite the defendant's reliance on certain assertions and testimony presented at trial that were not adopted by the court or challenged on appeal, it was not clearly erroneous for the court to characterize the defendant's labors or responsibility for the resulting fire as equivalent to that of his son.

In summation, the defendant engaged in specialized work that he knew or should have known required a professional license that he did not possess. The defendant failed to take necessary precautions when doing this specialized work that required a licensed professional and failed to install the chimney connector in accordance with applicable law and regulations. Accordingly, the defendant failed to exercise due care when undertaking this specialized endeavor. Because the risk of a fire was both within the contemplation of the applicable statutes and regulations of which the defendant was in violation, and the damages sustained were a foreseeable result of the improper installation of the chimney connector to the oil-fired boiler, the defendant's arguments that he did not owe a duty to the plaintiff's insured are without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Because Bruce Fern, Jr., is not a participant in this appeal, hereafter we will refer to Bruce Fern, Sr., as the defendant in this opinion.

[2] Specifically, the court described their experience as follows: "[The defendant] and [his son] have limited experience in installing boilers. Thirty years ago, [the defendant] helped a friend install a boiler. A long time ago, [the defendant's son] installed two boilers."

[3] Neither the occupant nor the children were home at the time of the fire or for almost twenty-four hours prior to the fire.

[4] The defendant's son testified that an adapter, or reducing collar, is the conical piece of metal that connected the pipe from the boiler to the flue.

[5] Evan Haynes, a licensed mechanical engineer who assisted in the investigation, determined that one of two causes likely resulted in the chimney connector becoming disconnected: "[The chimney connector] could simply just fall out through vibration or use. It also could fall out because of delayed ignition scenarios where, because the boiler is not running properly and is not set up properly, you could have delayed ignition of oil creating a puff that could push [the connector] out."

[6] For instance, despite his general contention that he owed no duty, the defendant asserts in his brief that "it would appear to be against public

policy to hold a gratuitous helper to the same standard of care as a skilled tradesman." Indeed, at oral argument before this court, the defendant stated that part of his argument concerned the applicable standard of care for any duty that he might have owed in this case.

[7] Depending on the particular statute, however, a statutory violation might not constitute negligence per se, but could establish a prima facie case of negligence or could provide evidence of negligence. See *Ward* v. *Greene*, 267 Conn. 539, 548, 839 A.2d 1259 (2004).

[8] This potential class of persons may be quite broad. See *Wright* v. *Brown*, 167 Conn. 464, 469, 356 A.2d 176 (1975) (with respect to quarantine provisions of General Statutes § 22-358, "the class of persons protected is not limited; rather the statute was intended to protect the general public or, as stated by the trial court, members of the community" [internal quotation marks omitted]).

[9] General Statutes § 20-330 (5) defines "heating, piping and cooling work" as "(A) the installation, repair, replacement, maintenance or alteration of any apparatus for piping, appliances, devices or accessories for heating systems, including sheet metal work, (B) the installation, repair, replacement, maintenance or alteration of air conditioning and refrigeration systems, boilers, including apparatus and piping for the generation or conveyance of steam and associated pumping equipment and process piping and the installation of tubing and piping mains and branch lines up to and including the closest valve to a machine or equipment used in the manufacturing process, but excluding millwright work, and (C) on-site operation, by manipulating, adjusting or controlling, with sufficient technical knowledge, as determined by the commissioner, (i) heating systems with a steam or water boiler maximum operating pressure of fifteen pounds per square inch gauge or greater, or (ii) air conditioning or refrigeration systems with an aggregate of more than fifty horsepower or kilowatt equivalency of fifty horsepower or of two hundred pounds of refrigerant. . . ."

[10] This purpose is more apparent from the regulations defining the particular licenses that may be issued by the Heating, Piping, Cooling, and Sheet Metal Work Board. See Regs., Conn. State Agencies § 20-332-5. Each of these licenses contain explicit limitations on who is able to acquire that license by defining the necessary training or experience required; see id., § 20-332-5 (a) (examination for unlimited heating-cooling contractor's license only available after "two (2) years as an unlimited licensed journeyperson or equivalent experience and training"); or by limiting the type of projects on which, or the manner in which, the holder may work. See id., § 20-332-5 (g) (limited heating contractor license allowed to work only on "hot water or steam heating systems for buildings not over three stories high with a total heating load not exceeding 500,000 BTU's and steam pressure not exceeding fifteen pounds" as well as related gas systems and "oil burners handling up to five gallons per hour"); see also id., § 20-332-5 (j) (limited heating journeyperson may install, service, and repair gas or oil fired burners "only while in the employ of a contractor licensed for such work"). To acquire a license, an individual must score at least 70 percent on the examination. Id., §§ 20-332-10a and 20-332-11a.

[11] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." A cause of action may be brought by "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b." General Statutes § 42-110g (a).

[12] The attempt by the defendant to analogize his situation to that of a neighbor assisting a homeowner in installing a boiler in the latter's home is not persuasive: unlike the actions of the defendant and his son here, the homeowner's actions in the hypothetical at the very least *could* fall within an explicit exception to the licensure requirement. See General Statutes § 20-340 (11) ("[t]he provisions of this chapter shall not apply to . . . persons engaged in the installation, maintenance, repair and service of glass or electrical, plumbing, fire protection sprinkler systems, solar, heating, piping, cooling and sheet metal equipment in and about single-family residences owned and occupied or to be occupied by such persons; provided any such installation, maintenance and repair shall be subject to inspection and approval by the building official of the municipality in which such residence is located and shall conform to the requirements of the State Building Code").

[13] In response to the questions of this court during oral argument, the defendant asserted that the purpose of the licensure statute was to protect

the public from unscrupulous contractors. While true, it is not, however, the only purpose. See *Hartford Hospital* v. *Dept. of Consumer Protection*, supra, 243 Conn. 719–20. Additionally, the defendant has not asserted on appeal that the failure to have the necessary occupational license is not a ground to assert a negligence per se claim because the failure to have that license was not the proximate cause of the fire.

[14] The court stated that standards 31 and 211 were part of our state's fire code. It did not explain, however, which portions of the fire code incorporated these standards.

We note that the provisions of our state fire safety code and our state fire prevention code generally do not apply to private single-family dwellings such as the property; see General Statutes § 29-292 (a) (1); Regs., Conn. State Agencies §§ 29-291a-1a (d) and 29-292-1e (b); and did not apply under the statutes and regulations in effect in 2011. See General Statutes (Rev. to 2011) § 29-292 (a); Regs., Conn. State Agencies (Rev. to 2011) §§ 29-291a-1 (d) (repealed May 7, 2015) and 29-292-1e (b) (amended effective October 2, 2012). Other applicable statutes and regulations, however, contain materially similar requirements; see footnote 16 of this opinion; and the defendant has not challenged the court's judgment on these grounds. See footnote 17 of this opinion.

[15] Standard 31 provides in relevant part: "The chimney connector shall extend through a chimney wall to the inner face or liner but not beyond, and shall be firmly cemented to masonry. A thimble shall be permitted to be used to facilitate removal of the chimney connector for cleaning, in which case the thimble shall be permanently cemented in place with high-temperature cement." National Fire Protection Assn., NFPA 31: Standard for the Installation of Oil-Burning Equipment (1992 Ed.) § 1-7.2.4, p. 31-12. Under the regulations in effect in 2011, this standard was incorporated by reference as our state's regulations on the installation and operation of oil burning equipment; see Regs., Conn. State Agencies (Rev. to 2011) § 29-317-3a (a) (repealed May 7, 2015); and private residential dwellings are not excepted. See General Statutes (Rev. to 2011) § 29-317 (a) and (b); Regs., Conn. State Agencies (Rev. to 2011) § 29-317-1a (b) and (d) (repealed May 7, 2015). (Pursuant to amendments ultimately effective January 1, 2013, however; see Public Acts 2010, No. 10-54, §§ 1 and 6; Public Acts 2009, No. 09-177, § 7; regulations adopted pursuant to this authority are now incorporated into the state fire prevention code. See General Statutes § 29-317 [a].) Additionally, § 1805.2 of the 2003 International Code for One- and Two-Family Dwellings portion of the 2005 State Building Code provides in relevant part: "A connector entering a masonry chimney shall extend through, but not beyond the wall and shall be flush with the inner face of the liner. Connectors, or thimbles where used, shall be firmly cemented into the masonry."

[16] The expert relied on standard 211 to address whether the concrete ring was a "thimble" as that term is used in standard 31. Standard 211 provides in relevant part: "Thimbles for chimneys or vent connectors shall be fireclay . . . galvanized steel of minimum thickness of 24 ga[u]ge, or material of equivalent durability. Thimbles shall be installed without damage to the liner. The thimble shall extend through the wall to, but not beyond, the inner face of the liner and shall be firmly cemented to masonry." National Fire Protection Assn., NFPA 211: Standard for Chimneys, Fireplaces, Vents, and Solid Fuel-Burning Appliances (1992 Ed.) § 3-1.8.1, p. 211-18. Thus, because the clay ring was only two inches long and did not extend to the vertical flue, the expert explained, it was not a "thimble" as that term is used in standard 31. The defendant has not asserted on appeal that either the court's reliance on this testimony or its application of the law was in error.

[17] "In cases involving the doctrine of negligence per se . . . the defendant ordinarily may avoid liability upon proof of a valid excuse or justification." *Gore* v. *People's Savings Bank*, 235 Conn. 360, 376, 665 A.2d 1341 (1995), quoting 2 Restatement (Second), Torts § 288A (1965). The defendant, on appeal, has focused primarily on whether a duty existed and has not provided any separate argument that his failure to abide by either the licensure requirements or state building code was excused or justified.

[18] "[O]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . .

The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. . . . Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation at hand would obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken." (Internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 373–74.

[19] We also note that the defendant has worked as a registered home improvement contractor for several decades.

[20] Even if the court premised the defendant's liability on his breach of a common-law duty to exercise reasonable care, the court would be permitted to rely on standards 31 and 211. To the extent that the defendant and his son *were* required to, and did, abide by these standards or similar statutes and regulations, compliance alone does not preclude liability for negligence. See *Allison* v. *Manetta*, 284 Conn. 389, 403, 933 A.2d 1197 (2007) ("[w]hile violation of a statute is negligence, compliance with a statute is not necessarily due care" [internal quotation marks omitted]); see also *Josephson* v. *Meyers*, 180 Conn. 302, 307–308, 429 A.2d 877 (1980) (duty of care satisfied by complying with statute "where the facts are similar to those contemplated by the statute and no special or unusual circumstances or dangers are present"). Alternatively, a court can consider a party's failure to abide by even technically inapplicable statutes as evidence of negligence. See *Considine* v. *Waterbury*, 279 Conn. 830, 860–69, 905 A.2d 70 (2006) (failure to abide by building code provisions that were technically inapplicable to property because they were adopted after construction nonetheless may constitute evidence of failure to exercise due care).

[21] The defendant also argues that public policy is against recognizing that he owed a duty in this case because "it would appear to be against public policy to hold a gratuitous helper to the same standard of care as a skilled tradesman." He has offered no law or analysis in support of this contention, however, and we will not consider it. See *Zappola* v. *Zappola*, 159 Conn. App. 84, 86–87, 122 A.3d 267 (2015).

[22] For instance, the defendant provided the following summary of his and his son's work: "We went there in the morning and disconnected the furnace and moved it out. And then they brought a new furnace. We moved it in. Got it repiped." His son described their labors similarly.

[23] Although the defendant testified that his position was wholly subservient to his son's directions, both with respect to the general project and with respect to the particular act of constructing and installing the chimney connector, the court was not required to credit this testimony. See *Burns* v. *Adler*, supra, 158 Conn. App. 802.